DECATUR PRODUCTION CREDIT ASSOCIATION, Plaintiff-Appellant, *v.* GEORGE E. MURPHY *et al.*, Defendants-Appellees—(The Illinois National Bank, Defendant).

Fourth District   No. 4—83—0158

Opinion filed November 3, 1983.

278

Wayne L. Bickes and Jeffrey D. Richardson, both of Rosenberg, Rosenberg, Bickes, Johnson & Richardson, Chartered, of Decatur, for appellant.

John L. Swartz, of Giffin, Winning, Lindner, Newkirk, Cohen & Bodewes, P.C., of Springfield, for appellee Herrin, Ltd.

Mark Rabin, of Springfield, for appellees Rolin C. Carr and Colleen K. Carr.

Richard A. Hollis, of Springfield, for appellee George E. Murphy.

PRESIDING JUSTICE WEBBER delivered the opinion of the court:

This appeal presents some novel questions concerning priorities in growing crops under the pertinent sections of the Uniform Commercial Code (UCC). (Ill. Rev. Stat. 1981, ch. 26, pars. 9—203, 9—204, 9—403, 9—312.) Plaintiff, Decatur Production Credit Association (PCA), was a secured creditor of the defendant debtor, George E. Murphy (Murphy). Defendant Rolin C. Carr (Carr) and Murphy had entered into a written agreement concerning the operation of the farm lands in which Murphy had an interest as a tenant on a crop-share basis as to the bulk of them and on a cash-rent basis as to the rest. Defendant Herrin, Ltd., furnished certain chemical products to Murphy for use in his farming operations. Defendant Illinois National Bank was a secured creditor of Carr, but has not participated in this appeal.

PCA filed suit for declaratory judgment in the circuit court of Sangamon County, seeking a declaration of its rights in the 1982 crops growing on the lands farmed by Murphy. In summary, the trial court held that Carr was entitled to one-fourth of the crops under his agreement with Murphy; that as to Murphy's one-fourth, Herrin, Ltd., had a paramount lien of $20,000 plus 18% interest, and that PCA had a lien on the balance of Murphy's interest to the extent of $116,080.80 plus interest at $41.6023 per day and attorney fees. The derivation of the figure representing PCA's lien is so obscure in the record as to defy rational analysis.

PCA has appealed the trial court's order. We affirm in part, reverse in part, and remand for an accounting.

The evidence at trial was not seriously controverted, but some recitation of it is necessary to an understanding of the case. Murphy had farmed for a number of years in the Springfield area. He apparently owned some tracts himself but they are not concerned in this litigation. On the tracts which are concerned, he held farm leases which were of the 50/50 crop-sharing nature, except for one tract, known as the Mendenhall property, which was on a cash-rent basis of $100 per acre. Murphy had financed his operations for many years through PCA, a federally chartered corporation and a part of the Federal farm credit system.

On or about March 27, 1981, Murphy signed a farm security agreement with PCA for the "crops: corn, soybeans and wheat which are now or will during the term of this Security Agreement become growing upon" certain tracts of land located in Sangamon County as

follows:

> "Bridges, 162 acres in Sections 20/29;
> Shuck, 85 acres in Section 16;
> Pearson, 268 acres in Sections 21/22;
> Mendenhall, 120 acres in Section 20;
> Neuman Estate, 34 acres in Section 21."

Other collateral included "farm products, stored grain" and a list of certain farm machinery, as had been customary over more than 20 years of doing business. Murphy signed the security agreement, financing statement, note and mortgage before PCA approved the loan. The loan for operating expenses was annual; each year the parties met to review payments of past due accounts and needs for the upcoming crop year, including personal living expenses of Murphy.

For 1981 PCA approved a total of $361,249.08 represented by a note due January 1, 1982. A portion of this represented renewal of old loans. Collateral for the note included the 1980 crops on hand, sale of the 1981 crops produced upon the foregoing acreage, and the sale of Murphy's farm machinery which was to take place following the 1981 harvest. Murphy also gave PCA a mortgage on his personal residence as further security. A financing statement in connection with the security agreement and covering the above-described tracts was filed with the recorder of Sangamon County on April 22, 1981.

PCA had determined that it would no longer finance Murphy after the 1981 crop year. Unquestionably he was in serious financial difficulties. The sale of the machinery was an important part of the scheme to pay off his loan, but without the machinery he could not continue farming.

Prior to the sale of the machinery, which occurred on March 30, 1982, Murphy had a discussion with Carr concerning farming operations. Murphy still had the leases on the approximately 667 acres described above. The gist of the discussion was that Carr would furnish the equipment and part of the labor for farming the tracts and in return would receive one-fourth of the crop. In order to purchase the machinery, Carr negotiated a loan from the Illinois National Bank for which he gave a security agreement; his financing statement with the Bank purported to cover his share of the 1982 crop on the Mendenhall, Pearson and Shuck tracts. As previously indicated, Illinois National Bank has not pursued this appeal, and we shall therefore ignore whatever interest it may have.

Murphy planted and harvested the 1981 crop, of which he sold a portion and stored a portion. During that year he paid PCA $62,543; however, PCA made no effort to call or accelerate the note due Jan-

uary 1, 1982. The machinery sale brought a total of $163,065, and this was paid over to PCA after the sale in March 1982. Carr purchased $24,000 of the machinery.

Prior to April 1, 1982, Murphy approached defendant Herrin, Ltd., with regard to furnishing fertilizer, chemicals, and other farming materials for the 1982 crop year. John E. Herrin, manager of Herrin, Ltd., testified that he prepared a note and financing statement and security agreement which Murphy signed. Herrin started delivering materials to Murphy on April 1, 1982. Prior to entering into the agreement with Murphy, Herrin did not cause anyone to make a check of the recorder's office to see if Murphy had pledged the 1982 crop to someone else. Herrin testified that he was aware that PCA had loaned money to Murphy. Herrin recorded its financing statement with the Sangamon County Recorder on April 12, 1982.

The security granted to Herrin, Ltd., was in the following traces:

| OWNER | LOCATION |
|---|---|
| Shutt [*sic*] Farm | approximately 100 acres Sec. 16, T.15, R.5 W Sangamon County |
| Pearson | approximately 280 acres Sec. 22, T.15, R.5 W Sangamon County |
| Mendenhall | approximately 259 acres Sec. 29, Sec. 20, T.15, R.5 W Sangamon County." |

Sometime in April 1982 Murphy and Carr entered into a written agreement, apparently formalizing their prior discussion. In pertinent part that agreement provided:

"1. Murphy will provide leased land, herbicides, fertilizer, insecticides, seeds, any other necessary chemicals, a grain truck and grain storage bins for at least 10,000 bushels and approximately one-half the labor for general farming.

2. Carr will acquire and furnish the equipment necessary to farm at least five hundred (500) acres for the raising of a corn and bean crop and Carr shall furnish one-half of the labor necessary for the soil preparation, planting, cultivating and harvesting of said crop.

3. Murphy and Carr will jointly share equally in the tenants portion of the crop or profits that the tenant is entitled to under the terms of the leases that Murphy has acquired from various land owners, it being acknowledged by Murphy that the leases provide and grant to the tenant fifty (50%) percent of

the annual crops of profits realized from crops."

Murphy testified that he believed he could make the agreement because the leases were his. PCA knew nothing of the agreement. Carr testified that he had had no relationship with the landlords and did not even know what the rent arrangements were. Murphy lost the Bridges tract for 1982 but gained an additional 159 acres from the Mendenhall property. All of the leases were on a 50/50 share basis except the Mendenhall, which was cash rent of $100 per acre. Murphy testified that he had paid Mendenhall $13,750 and still owed him a like amount. Notwithstanding the complications which might ensue, the trial judge, with the agreement of counsel, decided to treat the Mendenhall tract as if it were a 50/50 share basis lease.

Murphy then embarked on the production of the 1982 crop. He had the agreement with Carr and had obtained the fertilizer and other chemical products from Herrin, Ltd. He sold some property not covered by the PCA security agreement and also took funds from his savings. With these asserts in hand, he informed PCA on May 1, 1982, that he intended to continue farming during that year. On May 5, 1982, while running a routine check, PCA discovered the financing statement to Herrin, Ltd. Shortly afterwards it also discovered Carr's financing statement to Illinois National Bank for the purchase of the machinery and covering the same tracts as described in its security agreement. Murphy told PCA on July 19, 1982, that he had an arrangement with Carr but that Carr had no interest in the 1982 crop other than payments for the leasing of his equipment on an hourly basis.

On July 29, 1982, Murphy met with PCA with a view to obtaining additional funds for operating expenses. He applied for a loan of $10,248 to be added to the principal then outstanding. It seems clear from the record that he misrepresented the value of grain on hand and the amount of his indebtedness for fertilizer and chemicals. He signed a note, a security agreement, and a new financing statement which covered the additional Mendenhall land which he had acquired under lease. The financing statement was recorded August 9, 1982, and PCA's loan committee then denied the application on August 12, 1982.

Murphy, Carr, and Herrin, Ltd.'s officer all testified that without their contributions the 1982 crop could not have been raised.

On September 12, 1982, PCA brought this declaratory judgment action seeking an order as to the respective rights of the parties in the 1982 crop; it also sought a preliminary injunction against the transfer of any of the crop until the rights had been determined. On

September 27, 1982, an order was entered allowing Carr to harvest the crop and store it during the pendency of the suit. He was also to be allowed the expenses of harvesting, transporting, and storing the crop.

The trial court entered its written findings of fact and judgment order on December 3, 1982. It found that Murphy was free to enter into any kind of assignment or subleasing arrangement with regard to his leases and only the landlords had standing to object to such procedures; that the agreement with Carr was an assignment or sublease; and that Carr took free of any security interest because such a security interest was in the crop, not in the leases. Therefore Carr was entitled to one-fourth of the 1982 crop and was responsible for contract farming services rendered by others in the harvesting thereof.

As to Murphy, it found that he was entitled to one-fourth of the 1982 crop, subject to PCA's lien and that PCA's lien was subject to that of Herrin, Ltd. It further found that PCA's lien extended only to the crop grown on the tracts described in the March 1981 security agreement and that the July 1982 security agreement from Murphy to PCA was invalid.

As to Herrin, Ltd., it found that its security interest attached to Murphy's one-fourth share in the crop grown on the tracts described in its agreement of April 9, 1982, and was superior to that of PCA because it had provided new value. Its lien was limited to the amount of its note, $20,000, and not to an open account with Murphy.

PCA was allowed its attorney fees against Murphy and Herrin, Ltd.'s fees were denied since no default had been declared on its note.

We hold that the trial court was in error in awarding Carr one-fourth of the 1982 crop free of liens; that it was correct in awarding PCA a lien upon the 1982 crop grown on the tracts described in the March 1981 agreement; and that it was in error in awarding Herrin, Ltd., its lien, subject, however, to a determination upon remand as will be further explained.

■ A basic issue upon which much else in this case depends is whether the security agreement of March 1981 extends PCA's lien to the 1982 crop. Section 9—203 of the UCC provides in pertinent part:

"[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

(a) *** the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown *** a description of the land concerned; and

(b) value has been given; and

(c) the debtor has rights in the collateral."

Ill. Rev. Stat. 1981, ch. 26, par. 9—203.

This provision was substituted in the UCC in 1972 for various prior sections which dealt with the subject in a much different manner. (See Ill. Ann. Stat., ch. 26, par. 9—203, Illinois Code Comment, at 105 *et seq.* (Smith-Hurd 1974)) (Comment).) Prior section 9—204(2) (Ill. Rev. Stat. 1969, ch. 26, par. 9—204(2)) dealt with the matter in a negative way; it set forth specific situations in which a debtor had no rights in the collateral until a certain event occurred. (Comment, at 107.) Regarding crops, prior section 9—204(4)(a) (Ill. Rev. Stat. 1969, ch. 26, par. 9—204(4)(a)) specifically provided that no security interest could attach in crops which became such more than one year after the execution of the security agreement. All this was swept away by the 1972 amendment which specifically added the language [crops] "growing or to be grown." Comment, at 107.

■ Section 9—204(1) of the UCC (Ill. Rev. Stat. 1981, ch. 26, par. 9—204(1)) also bears on the issue. It provides in pertinent part: "[A] security agreement may provide that any obligations covered by the security agreement are to be secured by after-acquired collateral." The Uniform Commercial Code Comment (Ill. Ann. Stat., ch. 26, par. 9—204, at 117 (Smith-Hurd 1974)) states that this subsection makes clear that after-acquired collateral has an equal status with collateral in which the debtor has rights at the time value is given. The Illinois Code Comment (Ill. Ann. Stat., ch. 26, par. 9—204, at 116 (Smith-Hurd 1974)) specifically relates this provision to future crops.

The history of the 1972 amendments is well summarized in Meyer, *"Crops" as Collateral for an Article 9 Security Interest and Related Problems*, 16 U.C.C. L.J. 3, 11—13 (1982), as follows:

"In order to have an enforceable security interest under the 1972 Code, even between the debtor and the secured party, the security interest must attach to the appropriate collateral. The three basic requirements for attachment are found in Section 9—203 of the 1972 Code and Section 9—204 of the 1962 Code. Under both versions of the Code, there has to be an agreement creating a security interest in the crops. Since the secured party will generally not have possession of the crops, there must be a written agreement describing the collateral. The second requirement under both versions is that there must be value given.

While in both versions the debtor must have rights in the collateral, each is considerably different as far as growing crops

are concerned. Under 1962 Section 9—204(2)(a), the debtor has no rights in crops until they are planted or otherwise become growing crops. The 1972 Code eliminated this section as unnecessary. The 1972 version provides that a debtor can create a security interest in crops to be grown. Section 9—204(4)(a) of the 1962 Code was also eliminated by the 1972 Code. It provided:

No security interest attaches under an after-acquired property clause

(a) to crops which become such more than one year after the security agreement is executed except that a security interest in crops which is given in conjunction with a lease or a land purchase or improvement transaction evidenced by a contract, mortgage or deed of trust may if so agreed attach to crops to be grown on the land concerned during the period of such real estate transaction.

This subsection has been considered by many to be a significant limit on the 'floating lien' in that it generally prohibits a security interest under an after-acquired property clause from covering crops planted more than one year after the security agreement was executed. This means that, in a 1962 state, a crop lender must execute a new security agreement every year to cover the annual crop production loans or other financial arrangements. Yet, a financing statement needs to be filed only once every five years. This in part prompted the elimination of this section in the 1972 Code. The specific reasons given for the elimination of the provision in the 1972 Code are:

The obvious purpose of this provision was to protect a necessitous farmer from encumbering his crops for many years in the future. The provision did not work because there was no corresponding limit on the scope of a financing statement covering crops, and under the Code's notice-filing rules the priority position of a security arrangement covering successive crops would be as effectively protected by the filing of a first financing statement whether the granting clause as to successive crops was in one security agreement with an after-acquired property clause or in a succession of security agreements. On the other hand the clause did require an annual security agreement for crops even when the encumbrance on crops was agreed to as part of a long-term financing covering farm machinery and other assets. The provision thus appeared to be meaningless in operation except to cause unnecessary paperwork, but it did introduce some element of

uncertainty as to its purpose.

Under the 1972 Code, it seems clear that a security interest can be created in crops to be grown and the security agreement can cover crops that will be grown in the future. Accordingly, a security agreement involving crops in a 1972 state does not have to be executed every year. In effect, it could go on forever if the financing statement is renewed properly."

■■ ■ Based on these principles, we think it clear that PCA acquired a lien on the 1982 crop, but only on such as was grown on the tracts described in the March 1981 security agreement. Murphy signed a security agreement which covered crops "which are now or will during the term of this security agreement become growing." The security agreement further provided, "[T]he collateral therein granted continues as security for the debtor's indebtedness to secured party both present and future and whether such collateral be on hand or hereafter acquired." These provisions reasonably identify the fact that all future crops on the tracts concerned will be subject to the security interest. Murphy was given value, $361,744.08, representing renewal of old loans plus operating funds. The third element, rights of the debtor in collateral, seems clear. Murphy had his leases on the tracts upon which the 1982 crop was to be grown. Thus the three requirements of section 9—203(1) of the UCC were satisfied.

■■ The same is not true of the August 1982 security agreement and financing statement which was an attempt to bring the additional Mendenhall acreage in as collateral. No value was given. As was indicated above, PCA took the note, agreement and statement and then refused the loan. Its lien on the 1982 crop extends only to such as was raised on the tracts described in the March 1981 document. The trial court correctly held the August 1982 agreement to be a nullity.

Murphy has argued that the true test is to look at the course of dealing between himself and PCA over the years; that is, yearly arrangements had been made over a long period of time. Such an argument might have some substance if the wording of the security agreement were ambiguous. As its stands, the agreement expressly includes future crops and there is no necessity to resort to extrinsic circumstances to determine its meaning.

■■ We turn next to the situation regarding Carr. The result necessarily depends upon the nature of his agreement with Murphy. The trial court held it to be either an assignment or a sublease. We do not agree. The pertinent portions have been set forth above, and it appears to us that it was a contract for personal services for labor and material, or essentially for custom farming. The agreement describes

no real estate and its only reference to leaseholds is in one of the recitals which states, "Whereas, Murphy has been engaged in the business of farming for many years and has acquired the right to various lease agreements to lease certain real estate in Sangamon County, Illinois, on a year-to-year basis." It further provides that "Murphy and Carr will jointly share equally in the tenants [*sic*] portion of the crop ***." No right or interest in real estate was transferred, only an agreement to share profits in crops. The subject matter of the agreement was crops, not land.

We have already held that Murphy held the 1982 crop as collateral and had rights in it. A transfer of collateral in contravention of a security agreement is a valid transfer (Ill. Rev. Stat. 1981, ch. 26, par. 9—311), but the transfer does not occur free of a creditor's security interest (Ill. Rev. Stat. 1981, ch. 26, par. 9—306), and only the debtor's rights enure to the transferee. *Martin Brothers Implement Co. v. Diepholz* (1982), 109 Ill. App. 3d 283, 440 N.E.2d 320.

It follows that Carr has no priority over PCA whose lien became superior by virtue of the March 1981 security agreement. The record discloses that Carr made no search at the time of signing the agreement with Murphy, or before signing, to determine whether Murphy had already given any liens upon the 1982 crop; neither did he cause his attorney to make such a search. Murphy had told Carr that he had not pledged the grain.

Carr has argued that he should recover on a theory of *quantum meruit*. We do not agree. That theory is part of the remedial devices of implied contract. An implied contract cannot stand in the face of an express one. A third party cannot be held liable under an implied contract for work done under an explicit contract between two different parties merely because the third party benefited from the work. *Stewart v. McIntosh* (1942), 316 Ill. App. 212, 44 N.E.2d 451; *Vanderlaan v. Berry Construction Co.* (1970), 119 Ill. App. 2d 142, 255 N.E.2d 615.

Carr has also argued that PCA pursued a "course of dealing" by which it waived its lien; that is, refusing to finance Murphy after 1981, then discovering that he was still farming, that Herrin, Ltd., was providing fertilizer and chemicals, and that Carr was providing machinery and labor, and yet not foreclosing on a note due six months previously but waiting until the crop was growing. While Carr denominates this as a course of dealing, in our opinion the argument is really one of bad faith. Truly, PCA's actions are not to be commended. In addition to the facts recited above, we are disturbed by its transparent attempt to blanket in the additional Mendenhall acreage

by obtaining the second security agreement and then refusing the loan. While we feel that its actions deserve reprimand, they are not so egregious as to amount to bad faith.

As to the waiver argument, we again decline to pass upon whether it exists in this State. (Compare *Farmers State Bank v. Webel* (1983), 113 Ill. App. 3d 87, 446 N.E.2d 525.) In any event, the "sequence of previous conduct" required by section 1—205(1) of the UCC (Ill. Rev. Stat. 1981, ch. 26, par. 1—205(1)) is scarcely present here. We have already rejected it as part of Murphy's argument as being germane to the issues here and as part of Carr's bad-faith argument.

Lastly, we turn to the priority, if any, of Herrin, Ltd.'s lien. This is governed by section 9—312(2) of the UCC, which provides:

> "A perfected security interest in crops for new value given to enable the debtor to produce the crops during the production season and given not more than three months before the crops become growing crops by planting or otherwise takes priority over an earlier perfected security interest to the extent that such earlier interest secures obligations due more than six months before the crops becoming growing crops by planting or otherwise, even though the person giving new value had knowledge of the earlier security interest." Ill. Rev. Stat. 1981, ch. 26, par. 9—312(2).

Many commentators have been critical of this section. In White and Summers, Uniform Commercial Code sec. 25—6, at 1052 (2d ed. 1980), it is said in commenting on section 9—312(2): "[T]he drafters endeavored to codify priority disputes with respect to fixtures; apparently they lacked the will or the courage to tackle the analogous crop problem."

In Meyer, *"Crops" as Collateral for an Article 9 Security Interest and Related Problems*, 15 U.C.C. L.J. 3, 47 (1982), it is said: "Section 9—312(2) is probably the strangest priority rule in the Code."

Two principal difficulties present themselves in applying this section to the instant case. First, the record is entirely unclear when the 1982 crop was planted on the various tracts. Murphy's notes in the record indicate that some beans were planted in July, but they do not establish how many acres, or which acres, were so planted. Second, the record is equally obscure as to how much of Murphy's obligation to PCA was due on January 1, 1982. As to the latter, White and Summers aver that under this section "due" means "overdue." White and Summers, Uniform Commercial Code sec. 25—6, at 1053 (2d ed. 1980).

Herrin, Ltd.'s security agreement was dated April 12, 1982;

at least some, if not a major portion, of Murphy's note was overdue on January 1, 1982; it would therefore appear that Herrin, Ltd., had an absolute priority as to the tracts encompassed by its security agreement in crops planted from July 2 to July 12, 1982. We note that the parties have stipulated that Herrin, Ltd., has priority in the additional Mendenhall acres obtained in 1982 and not covered by PCA's security agreement of March 1981.

That portion of the trial court's order awarding Carr one-fourth of the 1982 crop is reversed without prejudice to whatever remedy may exist as between Murphy and Carr under their agreement; that portion of its order awarding PCA a lien upon the 1982 crop is modified to extend the lien to one-half the crop in priority over Carr together with its attorney fees; that portion of its order awarding Herrin, Ltd., a lien is vacated and the cause is remanded with directions to take an accounting to determine the time at which the crop became growing on the tracts described in Herrin, Ltd.'s security agreement of April 1982 and to determine how much of Murphy's obligation was overdue to PCA on January 1, 1982. Herrin, Ltd., should then be awarded a lien superior to PCA in the crop planted between July 2 and July 12, 1982, on those tracts described in its agreement and to the extent that Murphy's obligation was overdue on January 1, 1982, together with its superior lien upon the additional Mendanhall acres; the denial of Herrin, Ltd.'s attorney fees is affirmed; all in accordance with the views expressed in this opinion.

Affirmed in part, reversed in part and remanded with directions.

MILLS and TRAPP, JJ., concur.