Gene THOMPSON and Jean D. Thompson, individually and as members of a joint venture consisting of Mel Danner, Max Danner, Gene Thompson and Jean D. Thompson, and "The Joint Venture" comprised of Max Danner, Mel Danner, Gene Thompson and Jean D. Thompson, Plaintiffs, Appellants and Cross–Appellees,

v.

Max DANNER and Mel Danner, Defendants and Appellees,

and

First American Bank and Trust Company of Grafton, Defendant, Appellee and Cross–Appellant.

Max DANNER and Mel Danner, Plaintiffs,

v.

Gene THOMPSON Chip Potatoes, Inc., a North Dakota Corporation, and Jean D. Thompson, an individual, Defendants and Third–Party Plaintiffs,

v.

FIRST AMERICAN BANK AND TRUST COMPANY OF GRAFTON, Third–Party Defendant.

Civ. Nos. 930052, 930066.

Supreme Court of North Dakota.

Oct. 27, 1993.

Patrick W. Fisher, of McConn, Fisher, Olson & Daley, Grand Forks, for plaintiffs and appellants.

Nicholas B. Hall, of The Law Office, Ltd., Grafton, for defendant and appellee First American Bank and Trust Co. of Grafton.

Joel Frederick Arnason, of Arnason Law Office, Grand Forks, for defendants and appellees Max Danner and Mel Danner. No appearance.

SANDSTROM, Justice.

Gene and Jean D. Thompson appealed from district court judgments on an accounting of expenses for and income from potato crops grown by a joint venture consisting of

the Thompsons and Max and Mel Danner. First American Bank and Trust of Grafton [Bank] cross-appealed. We hold: (1) the Bank's security interest in future crops ultimately grown by the joint venture, but which was given to the Bank by the Danners prior to formation of the joint venture, is superior to the interests of the joint venture and its participants; (2) the Bank is not entitled, under the terms of the security agreement, to storage payments as secured "proceeds" of the potato crops; and (3) Jean Thompson, as a joint venturer, may not claim an agricultural processor's lien under Chapter 35–30, N.D.C.C., against crops, and the resulting proceeds, grown by the joint venture. We reject other assertions of reversible error and, accordingly, affirm the judgments.

## I

Gene and Jean Thompson are married. Jean is the mother of Max and Mel Danner. Gene is the Danners' stepfather. Gene Thompson Chip Potatoes, Inc., is a corporation whose sole stockholder is Jean Thompson.

In early 1990, the Thompsons and the Danners informally discussed forming a joint venture to grow 1990 potato crops. This venture was to consist of crops to be grown on approximately 850 acres, with the Thompsons contributing the use of approximately 160 acres of land they had leased from the Danners in 1989, and the Danners contributing the use of the remaining acreage which they either owned or had leased from others.

On April 3, 1990, the Danners executed a security agreement and financing statement with the Bank, pledging as security all 1990 crops to be grown on their farmland, including the entire 850 acres where joint venture potatoes were subsequently grown. In exchange, the Bank advanced the Danners $408,300 for their 1990 farming expenses and refinanced $336,696 in the Danners' existing farm debt from the previous crop year. The financing statement was filed on April 12, 1990. The Danners did not disclose to the Bank that they had discussed the possibility of forming a joint venture with the Thompsons when they executed the security agreement.

The Thompsons and Danners began planting the potato crops on April 25, 1990. Planting was not completed until sometime in May 1990. Max and Mel Danner and Gene and Jean Thompson did not sign the following undated written joint venture agreement until late June and early July 1990.

"This agreement covers the 1990 Potato Crop of approximately 850 Acres grown as a joint venture by Danners and Thompsons. Russet contracts Mel and Max Danner signed with Simplot and Northern Potato Co and potatoes grown for chip contract that Thompsons have with Frito Lay Inc are covered by this agreement.

"Proceeds after all expenses will be split as follows:

"60%—Mel & Max Danner

"40%—Jean and Gene Thompson

"Separate storage deal will be handled by Gene Thompson Chip Potatoes, Inc, who will receive 100% of storage fees."

The potato harvest began in mid-September 1990. Although the Danners provided some labor and fuel, Jean Thompson and her wholly-owned corporation, Gene Thompson Chip Potatoes, Inc., provided most of the trucks and harvesters used in the potato harvesting operation. After harvest was completed, the Thompsons learned that the Bank was receiving the proceeds of the potato crops pursuant to the security agreement given by the Danners. On November 29, 1990, Jean Thompson and the corporation filed an agricultural processor's lien under Chapter 35–30, N.D.C.C., in the amount of $165,000, and asserted a first priority lien over the crop proceeds. *See* N.D.C.C. § 35–30–03.

In February 1991, the Danners brought an action against Jean Thompson and the corporation seeking to have the agricultural processor's lien invalidated. Jean Thompson and the corporation brought a third-party action against the Bank seeking to have their agricultural processor's lien declared superior to the Bank's security interest in the potato crops. In March 1991, the Thompsons brought an action against the Danners and the Bank for an accounting of joint ven-

ture income and expenses. The trial court consolidated the two actions.

After a summary judgment proceeding, an evidentiary hearing, and a trial, the court determined the Danners and the Thompsons had entered into a joint venture to grow 1990 potato crops on the 850 acres, but found "[i]nsufficient evidence ... to allow the Court to make a definitive finding with regard to exactly when the Venture was created." The trial court, however, determined the Bank's security interest was perfected on April 12, 1990, "prior to the creation of the Danner–Thompson Joint Venture." The trial court also determined the misdescription of three tracts of land in the financing statement did not render the Bank's security interest ineffective.

The trial court also ruled Jean Thompson's corporation was the "alter ego" of the Thompsons in any dealings involving the corporation and the joint venture and refused to recognize its separate corporate existence. The court ruled Jean Thompson, as a joint venturer, could not place a valid agricultural processor's lien under Chapter 35–30, N.D.C.C., on venture assets in which she had an interest in net proceeds. The trial court found the Danners had a "proprietary interest," through lease or direct ownership, of all 850 acres of land on which the joint venture grew the potato crops. However, because the Danners had leased the 160 acres to the Thompsons in 1989 before the Danners executed the security agreement, the trial court ruled the Danners could not grant the Bank a valid security interest covering the crops planted on that leased property. The court determined that, after April 12, 1990, the Bank had a priority creditor position as to all others having claims against the joint venture regarding the crops on the remainder of the 850 acres. The court also ruled, although $26,825 in contract storage payments would normally constitute "proceeds" of the potato crops subject to the Bank's security agreement, because this storage fee income was intended by the joint venturers to be outside the scope of the venture, the Bank was not entitled to the storage payments.

In accordance with these rulings, the trial court ordered distribution of joint venture assets held in escrow. The court granted the joint venture a $325,558 judgment against the Danners; granted the Thompsons a $118,206.31 judgment against the joint venture; and ordered the remaining joint venture funds be distributed 60 percent to the Danners and 40 percent to the Thompsons. The Thompsons and the Bank appealed.

## II

The trial court ruled the Bank perfected its security interest in the Danners' 1990 crops on April 12, 1990, when the Bank filed the financing statement, and this perfection preceded formation of the joint venture. Based on these determinations, the trial court ruled the joint venture crops grown on the land contributed to the joint venture by the Danners remained subject to the Bank's prior perfected security interest. We find no error in any of these rulings.

## A

■ The creation of a perfected security interest is accomplished by a two-step process: attachment and perfection. *See* N.D.C.C. § 41–09–24 [U.C.C. § 9–303]. While "attachment" relates to the creation and enforceability of a security interest between the parties to the transaction, "perfection" is an additional step which makes the security interest effective against third parties. *Citizens Nat. Bank of Evansville v. Wedel,* 489 N.E.2d 1203, 1205 (Ind.Ct.App. 1986). When the security interest is intended to cover crops growing or to be grown, attachment occurs once the debtor has signed a security agreement containing a description of the collateral and of the land concerned, value has been given, and the debtor has rights in the collateral. N.D.C.C. § 41–09–16(1) and (2) [U.C.C. § 9–203]. *See also Thet Mah & Assoc. v. First Bank of N.D. (NA),* 336 N.W.2d 134, 139 (N.D.1983). A creditor perfects a security interest in crops to be grown by filing an appropriate financing statement. N.D.C.C. § 41–09–23(1) [U.C.C. § 9–302]. If a creditor completes the required steps for perfection prior to attachment of its security interest, the date of perfection is fixed as of the date the interest attaches. N.D.C.C. § 41–09–24(1)

[U.C.C. § 9–303]; *Benson County Co-op. Credit Union v. Central Livestock Ass'n, Inc.,* 300 N.W.2d 236, 240 (N.D.1980).

In this case, the Danners, on April 3, 1990, signed a security agreement describing the 1990 crops as the collateral and giving the legal description of the land on which the crops were to be grown. The Bank gave value in the form of a renewal of a prior operating loan plus additional operating funds for the 1990 crop year. *See* N.D.C.C. § 41–01–11(44) [U.C.C. § 1–201]. The question remaining is when the Danners acquired rights in the collateral.

■ Thompsons rely on *In Re Glinz,* 46 B.R. 266, 272 (Bankr.D.N.D.1984), in which the court, applying North Dakota law, said when the collateral given by the debtor is crops to be grown, the debtor acquires rights in the collateral when the crops are planted. Under this rationale, the Bank's security interest in this case could not have been perfected on April 12, 1990, as the trial court ruled, but could only have been perfected when the planting was completed sometime in May 1990.

Before 1973, North Dakota statutes directly supported the *Glinz* court's statement. When North Dakota originally adopted the Uniform Commercial Code in 1965, N.D.C.C. § 41–09–17(2)(a) [U.C.C. § 9–204] specifically provided a "debtor has no rights ... in crops until they are planted or otherwise become growing crops...." This provision was eliminated from the U.C.C. in 1972 and North Dakota adopted the change in 1973. *See* 1973 N.D.Sess.Laws Ch. 343 § 12. The commentary to the 1972 version of the U.C.C. explains former Section 9–204(2) was eliminated because it was "unnecessary and in some cases confusing. Its operation appeared to be arbitrary, and it is believed that the questions considered are best left to the courts." 3 U.L.A. *Uniform Commercial Code,* at p. 447 (1992). Commentators have noted deletion of the rule that a debtor has no rights in a crop until it is planted or otherwise becomes growing reflects a major change from the original 1962 version of the U.C.C. *See, e.g.,* J. Miller, *Farm Collateral Under the UCC: "Those Are Some Mighty Tall Silos, Ain't They Fella?",* 2 Agricultural Law Journal 253, 273 (1980). The difference between the attachment of a security interest in crops in the 1962 and 1972 versions of the U.C.C. is highlighted in K. Meyer, *"Crops" as Collateral for an Article 9 Security Interest and Related Problems,* 15 U.C.C. Law Journal 3, 11 (1982):

"While in both versions the debtor must have rights in the collateral, each is considerably different as far as growing crops are concerned. Under 1962 Section 9–204(2)(a), the debtor has no rights in crops until they are planted or otherwise become growing crops. The 1972 Code eliminated this section as unnecessary. The 1972 version provides that a debtor can create a security interest in crops to be grown." [Footnotes omitted.]

After examining the history of the 1972 amendments to the U.C.C., the court in *Decatur Production Credit Ass'n v. Murphy,* 119 Ill.App.3d 277, 119 Ill.App.3d 277, 284, 456 N.E.2d 267, 274 (1983), ruled the debtor had rights in future crops sufficient to support attachment of a security interest because, at the time the debtor entered into the agreement, he had "leases on the tracts upon which the ... crop was to be grown." We believe the ruling of the *Decatur* court is correct under the 1972 amendments to the U.C.C., and conclude crops need not actually be planted in order for a debtor to have rights in the collateral sufficient for a security interest in future crops to attach. This construction avoids the uncertainty over the priority of a lender's security when there is any delay between the advancement of operating funds and the planting of a crop. We recognize, unlike the U.C.C., North Dakota law provides a "security interest upon crops attaches only to the crop next maturing after the delivery of the security agreement." N.D.C.C. § 35–05–01.1. But there is no conflict between this provision and our holding that attachment can occur before the crops are actually planted.

In this case, the trial court found the Danners had a "proprietary interest," through leases or direct ownership, of the land on which the crops were to be grown. The Danners therefore had rights in the collateral at the time they signed the agreement on

April 3, 1990, and the Bank's security interest therefore attached on that date. *See Decatur.* The trial court did not err in determining the Bank's security interest was perfected upon filing the financing statement on April 12, 1990.

### B

■ Although the trial court was unable to find exactly when the joint venture was formed, the court did find the joint venture came into existence after the Bank perfected its security interest in the Danners' potato crops. We will not reverse a trial court's finding of fact unless it is clearly erroneous. Rule 52(a), N.D.R.Civ.P. A finding of fact is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Sorum v. Schwartz,* 411 N.W.2d 652, 654 (N.D.1987).

■ In addition to limitation as to scope and duration, an enterprise does not constitute a joint venture unless the following four elements are present: (1) contribution by the parties of money, property, time, or skill in some common undertaking, but the contributions need not be equal or of the same nature [*Voltz v. Dudgeon,* 334 N.W.2d 204, 206 (N.D. 1983) ]; (2) a proprietary interest and right of mutual control over the engaged property [*Voltz* ]; (3) an express or implied agreement for the sharing of profits, and usually, but not necessarily, of losses [*Voltz; Edwards v. Thompson,* 336 N.W.2d 612, 616 (N.D.1983) ]; and (4) an express or implied contract showing a joint venture was formed [*Voltz* ].

■ Although a checking account and some charge accounts with the joint name of the Danners and the Thompsons were opened in early April 1990, we cannot say this necessitated finding the joint venture was formed prior to perfection of the Bank's security interest. Gene Thompson's son testified that after the completion of planting he discussed the joint venture with Max Danner and expected to be a joint venture participant with a 10 percent share of the profits. Jean Thompson signed the written agreement in late June 1990. Max Danner balked at signing the agreement on several occasions. The Danners and Gene Thompson finally signed the agreement in early July 1990. This evidence could be viewed as showing an uncertainty as to the nature, the scope and the participants in the joint venture which existed for some time after the Bank had perfected its security interest. We are not left with a definite and firm conviction the trial court was mistaken in finding the joint venture came into existence after the Bank perfected its security interest on April 12, 1990.

### C

The Thompsons argue the trial court erred in concluding the Bank had a valid security interest in the potato crops owned by the joint venture.

■ Relying on the proposition that partnership legal principles apply to joint ventures, *Edwards,* 336 N.W.2d at 616 n. 7, the Thompsons argue the trial court's conclusion fails to recognize the important principle of partnership law "that an individual partner has no direct ownership interest in the property of the partnership nor has any possessory right to any assets of the partnership until dissolution." They rely on provisions of the Uniform Partnership Act which state in part "[a] partner is coowner with his partners of specific partnership property holding as a tenant in partnership," and "[t]he incidents of this tenancy are such that … [a] partner's right in specific partnership property is not subject to attachment or execution, except on a claim against the partnership." N.D.C.C. § 45–08–02(1) and (2)(c).

We hold application of this general partnership principle does not result in the extinguishment of a valid security interest on crops to be grown on property contributed to the partnership by one of the partners. In discussing the scope of the identical Uniform Partnership Act counterpart to § 45–08–02(2)(c), commentators have logically pointed out that:

> "… the property remains subject to liens in favor of a partner's individual creditor that existed prior to the transfer of the property to the partnership. Although [this] … result is not clearly mandated by

the language of the section, and there are apparently no cases, the result is necessary for practical reasons, to prevent partners from evading their creditors through transfers to the partnership."

I *Bromberg and Ribstein on Partnership,* § 3.05, at p. 3:68 (1991).

We agree with the rationale of the Georgia Court of Appeals in *Southwest Georgia Prod. Credit Ass'n v. James,* 180 Ga.App. 795, 350 S.E.2d 786 (1986). In *James,* the debtor, Whaley, gave the Bank, Southwest, a security interest covering crops grown on her land within seven years of the date of the financing statement. Later, the debtor entered into a joint venture agreement with James, who was to grow crops on the land. Under this agreement, neither Whaley nor James was to acquire rights to the proceeds of the crop until after profits had been determined. No profits were realized and the Bank claimed the proceeds of the crop under its security agreement. The trial court had concluded that because Whaley never acquired an interest in the proceeds of the crop, she had no rights in the proceeds to which the Bank's security interest could attach. The appellate court reversed:

"Whaley, at the time she entered into a financing arrangement with Southwest, was the sole owner of any and all crops, in praesenti or in futuro, planted, grown or produced on the described property.... She thus had 'rights,' albeit inchoate rights, in any and all crops to be planted, grown or produced on her property in the future and pursuant to the terms of her agreement with Southwest, she transferred those rights for a period of seven years or until the indebtedness was paid. A debtor (such as Whaley in this case) may not defeat the rights so acquired by the creditor (Southwest) by turning over the property described in the financing statement to a third party to produce a crop covered by the terms of the financing statement, where said statement has been executed and recorded according to law. From the recorded financing statement, James had legal notice of the security interest that Southwest held on the crop to be produced which secured the payment of

an outstanding indebtedness. Thus, he could not defeat that security interest by operation of the subsequent joint venture agreement made between Whaley and himself to which Southwest was not a party, and where Southwest had not consented to such agreement and the waiver of its prior interest."

*James,* 350 S.E.2d at 787–788 [citations omitted]. *See also Production Credit Association of Minot v. Melland,* 278 N.W.2d 780 (N.D.1979). *Cf. Decatur,* 456 N.E.2d at 274 ["A transfer of collateral in contravention of a security agreement is a valid transfer ... but the transfer does not occur free of a creditor's security interest ... and only the debtor's rights inure to the transferee."].

We have reviewed the cases relied on by the Thompsons. None of them holds a joint venturer may defeat the rights of a prior secured creditor by contributing the secured property to a joint venture. We conclude the trial court did not err in ruling the Bank had a valid and effective security interest on the crops contributed to the joint venture by the Danners.

### III

█ In its cross-appeal, the Bank asserts the trial court erred in ruling the Bank was not entitled, under its security agreement with the Danners, to $26,825 in contract storage payments. The trial court held these storage payments would ordinarily constitute "proceeds" of the potato crops, but concluded the Bank was not entitled to these funds because, under the written joint venture agreement, "it was clear that storage fee income was intended to be outside the scope of the Venture." We agree with the Bank that, because the potato crops were secured prior to the formation of the joint venture, the parties' indication in the written joint venture agreement that storage fee income was to be handled outside of the agreement has no effect on the security interest of the Bank.

█ Nevertheless, we will not set aside a correct result merely because the trial court assigned an incorrect reason if the result is the same under the correct law and reasoning. *Westman v. Dessellier,* 459 N.W.2d 545,

547 (N.D.1990). Section 41–09–27(1) [U.C.C. § 9–306], N.D.C.C., defines "proceeds" as "whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds." In this case, the Danners granted the Bank a security interest in:

> "*Crops and Products and Proceeds of Crops:* All crops, annual or perennial, and all products and proceeds of crops, supplementary price payments and payments made in lieu of crop proceeds, including crop insurance payments, but specifically excluding diversion payments or third party payments made to producers which are not directly related to crop production or proceeds."

█ The disputed storage payments were received by the Danners through a contract they had with Simplot. The Simplot contracts contained allowances for storage because the contracts called for delayed deliveries of the potatoes. The contracts provided for a fixed amount per cwt. based on a sliding scale reflecting the time spent in storage. Under the contract, Simplot agreed to pay the Danners a storage fee ranging from $.40 per cwt. for potatoes delivered between November 1–30, to $1.50 per cwt. for potatoes delivered between June 16–30.

Two courts have held storage payments received in connection with participation in a government grain set-aside program are not "proceeds" of the grain placed in storage under U.C.C. § 9–306. *See* Annot., *Secured Transactions: Government Agricultural Program Payments as "Proceeds" of Agricultural Products Under UCC § 9–306,* 79 A.L.R.4th 903, 930 (1990). In *In re Sumner,* 69 B.R. 758, 763 (Bankr.D.Or.1986), the court held storage payments under a debtor's contract with the Agricultural Stabilization and Conservation Service whereby the debtor kept grain stored on his farm in storage for an additional year were "not proceeds of the crop in storage." Likewise, in *In re Connelly,* 41 B.R. 217, 220 (Bankr.D.Minn.1984), the court held similar contract grain storage payments were not proceeds of the crop:

> "[I]t seems the term 'proceeds' ... is not broad enough to cover payments made on account of grain in storage. The term is meant to include anything that is received

in consequence of the disposition of collateral. *Production Credit Association of Minot v. Melland,* 278 N.W.2d 780 (N.D. 1979). In the instant case, no collateral has been disposed of, it has merely been pledged by the Debtors as security for a loan from the Commodity Credit Corporation."

*Compare In re Boyd Elevator, Inc.,* 63 B.R. 689, 693 (Bankr.N.D.Tex.1986) [money paid to debtor as storage charges are accounts or general intangibles]. At least one treatise appears to approve the analysis in *Sumner* and *Connelly,* describing the storage payments at issue in those cases as being "essentially earned for rendering a service to the government." 1D P. Coogan, W. Hogan, D. Vagts, J. McDonnell, *Secured Transactions under the Uniform Commercial Code* § 27.-06[3][b], at p. 27–70 (1993) [footnote omitted]. We have found no cases holding storage payments are "proceeds" of the crops in storage.

The storage payments under the Simplot contract are analogous to the government storage payments in *Sumner* and *Connelly.* Contrary to the Bank's assertion that these payments are merely "a premium added to the agreed upon price," the amount of the storage payment is directly related to the length of time the potatoes are held in storage. The payment is not received in consequence of the disposition of the crop, but is additional compensation for a service provided by the Danners to Simplot. We conclude these contract storage payments are not "proceeds" of the potato crop, and the trial court correctly ruled that the Bank was not entitled to them under its security agreement with the Danners.

## IV

The Thompsons do not challenge the trial court's ruling that Gene Thompson Chip Potato, Inc., was the "alter ego" of the Thompsons in any dealings involving the corporation and the joint venture and in disregarding its separate corporate existence. Jean Thompson, however, asserts the trial court erred in ruling a joint venturer may not validly claim an agricultural processor's lien against crops, and the resulting proceeds,

grown by the joint venture. We hold the trial court correctly invalidated the lien.

■ Section 35–30–01, N.D.C.C., provided at the relevant time:

"*35–30–01. Agricultural processor's lien authorized.* Any person who processes any crop or agricultural product is entitled to a lien upon the crop or product processed for the reasonable value of the services performed. As used in this chapter, the term 'processor' includes persons threshing, combining, drying, or harvesting any crop or agricultural product. The agricultural processor's lien is effective from the date the processing is completed."

Chapter 35–30, N.D.C.C., replaced several more particularized lien provisions existing under prior law, including the threshing lien. *See* 1987 N.D. Sess. Laws Ch. 412 §§ 3 and 7. Construing the former threshing lien statute, this Court, in *Mace v. Cole,* 50 N.D. 866, 198 N.W. 816 (1924), held when a person farms the land of another under a cropping contract where the landowner and cropper agree to each pay one-half of the threshing bill and receive one-half of the crops produced, the cropper who threshes the grain is entitled to a threshing lien on the landowner's grain for the landowner's one-half of the threshing bill. The Court emphasized the cropper did not claim a lien for the expenses of threshing the grain belonging to himself, and explained:

"The obvious purpose of the statute creating the threshing lien is to insure a person engaged in threshing payment for the services rendered others in threshing grain for them; and hence, when a thresher is engaged to thresh grain, he need not investigate to ascertain what liens or incumbrances there may be outstanding against the grain, for he knows that he is given security upon the grain threshed for the amount of the thresh bill, and this without regard to existing liens or incumbrances.... There was no intention to create a lien in favor of a person who threshes his own grain so as to enable him to be compensated for such services even at the expense of persons holding liens or incumbrances thereon."

*Mace,* 50 N.D. at 870–871, 198 N.W. at 818. *Mace* establishes the former threshing lien statute was not intended to authorize liens in favor of persons who thresh their own grain.

In *Blank v. Fenton,* 54 N.D. 837, 211 N.W. 590 (1926), the Court, in dicta, appears to place in question the continuing validity of the *Mace* court's observation. In *Blank,* like *Mace,* a cropper sought to enforce a threshing lien on the landlord's one-half share of the grain in satisfaction of the landlord's one-half share of the threshing bill. The Court, following *Mace,* ruled the cropper was entitled to judgment for conversion in the amount of the lien. The Court noted, however, the threshing lien statute was amended after *Mace* was decided and the statutory requirement that a lien is authorized only for persons who thresh grain "for another" was removed. *See* 1925 N.D.Sess.Laws Ch. 160 § 1. The Court said, by deleting the "for another" language, "[t]he intent of the Legislature was to subject the grain, irrespective of ownership, to the expense of threshing." *Blank,* 54 N.D. at 840, 211 N.W. at 591.

■ We disapprove the dicta in *Blank.* Although § 35–30–01, like the threshing lien statute at issue in *Blank,* does not expressly contain the limiting language "for another," § 35–30–02(1) and (2), like the threshing lien provision [*see* 1925 N.D. Sess. Laws Ch. 160 § 2], nevertheless requires the verified lien statement include both the name and address of the processor as well as the name and address of the person for whom the processing was done. In interpreting a statute, we must presume the legislature did not intend absurd and ludicrous results or unjust consequences. *Resolution Trust Corp. v. Dickinson Econo–Storage,* 474 N.W.2d 50, 52 (N.D. 1991). As the trial court reasoned, allowing a farmer a first priority lien for the expense of harvesting his own crops would result in the farmer defeating the rights of the lender who advanced the funds to finance the farming operation in the first instance. Lenders would be understandably reluctant to advance operating funds. We do not believe the legislature intended such a result.

Jean Thompson argues, under *Mace,* she at least has a right to assert an agricultural

processor's lien on the part of the crops that could be considered to be owned by the Danners and Gene Thompson.

Under the cropping contract in *Mace,* the cropper was required to deliver to the landowner, not a sum of money equal to the value of the landowner's share of the crop, but the particular portion of the crop itself that he agreed to deliver. Although the cropper had a contractual duty to harvest the entire crop, the crop was divided and delivered to the respective parties in the field as it was threshed. The lien placed on the landowner's stored grain therefore encumbered only the grain owned and possessed by the landowner. Here, the Danners and Thompsons, under the joint venture agreement, did not have specific individual rights to ownership or possession of any part of the potato crop itself. Rather, they had rights in specific percentages of the proceeds of the crop after deducting all joint venture expenses. Jean Thompson, as well as the other joint venture participants, therefore had an interest in the entire crop at all pertinent times up until distribution of the proceeds after deducting expenses. As noted by the trial court, those anticipated expenses included those incident to planting, as well as harvesting, the potato crops. In other words, the harvesting expenses for which Jean Thompson claims a lien constitute a contribution to the common undertaking of the joint venture. *Voltz.* She is not entitled to a lien for these contemplated services.

We conclude the trial court did not err in ruling Jean Thompson was not entitled to an agricultural processor's lien in this case.

## V

The Bank and the Thompsons claim other instances of reversible error by the trial court.

### A

■ In its cross-appeal, the Bank challenges the trial court's finding the Danners leased three tracts to the Thompsons in 1989 for the 1990 crop season. The Bank does not argue its security interest is valid in the lands previously leased to the Thompsons, but asserts the finding of the lease itself is clearly erroneous.

Jean Thompson testified that in 1989 the Thompsons prepayed the Danners' land rent for the 1990 crop season. The Thompsons also produced a cancelled check written to the Danners and dated July 20, 1989, which included a notation it was for "Land Rent." According to Max Danner, this payment was not for 1990 land rent, but was for final settlement of a joint potato marketing effort by the Thompsons and the Danners in 1988. Having reviewed the record, we cannot say the trial court's finding that the Thompsons leased the tracts from the Danners in 1989 for the 1990 crop year is clearly erroneous.

### B

The Thompsons argue misdescriptions of three tracts of land in the security agreement and financing statement render the Bank's security interest in those tracts ineffective. Each tract is identified by a quarter section or half section referenced with the township and range. Each tract description is followed by the name of the owner of that tract in parentheses. In two instances of misdescription, the Danners owned the land, but township and range numbers were interchanged or incorrect. In the third misdescription, the part of the section was described as "E¼" instead of "SE¼." Under the circumstances, the misdescriptions do not render the Bank's security interest in these tracts ineffective.

■ First, the description of the property in the security agreement itself is sufficient as between the Danners and the Bank "if it reasonably identifies what is described." N.D.C.C. § 41–09–10 [U.C.C. § 9–110]. In this case, the trial court found "there was no question" which farmlands were intended by the Danners and the Bank to be covered by their security agreement. Because neither party to the security agreement sought to avoid its effect, their agreement is valid. *See First State Bank v. Shirley Ag Service, Inc.,* 417 N.W.2d 448, 452 (Iowa 1987).

■ Second, the objective of filing a financing statement is to give notice sufficient to alert an interested party that there

may be a prior security interest in the described collateral. *See* 9 R. Anderson, *Uniform Commercial Code* § 9–402:6 (3d ed. 1985). In North Dakota, when a financing statement covers crops growing or to be grown, the statement must contain a description of the real estate concerned which is "sufficient if it were contained in a mortgage of the real estate to give constructive notice of the mortgage under the law of this state." N.D.C.C. § 41–09–41(1) and (9) [U.C.C. § 9–402]. A financing statement substantially complying with the requirements of the statute "is effective even though it contains minor errors which are not seriously misleading." N.D.C.C. § 41–09–41(8) [U.C.C. § 9–402]. Generally, a mortgage is effective if the description of the property is sufficiently definite to enable the land to be located. *See generally Poyzer v. Amenia Seed and Grain Co.*, 381 N.W.2d 192, 195 (N.D.1986); 55 Am.Jur.2d *Mortgages* § 116 (1971). In 9 R. Anderson, *Uniform Commercial Code* § 9–402:6, at pp. 447–448, the author explains:

"Further inquiry beyond the financing statement is contemplated by the Code as 'the financing statement's purpose is to merely alert the third party as to the need for further investigation, never to provide a comprehensive data bank as to the details of prior security arrangements.'

"The notice system of the Code places the burden of further inquiry upon anyone seeking additional information. The fact that the financing statement is not intended to be all-informative is borne out by the fact that the statement must contain 'an address of the secured party from which information concerning the security interest may be obtained....'" [Footnotes omitted].

█ Finally, under the Uniform Commercial Code, actual knowledge is notice of a fact which can, under some circumstances, supersede the requirement of notice. *Red River Commodities, Inc. v. Eidsness*, 459 N.W.2d 805, 809 (N.D.1990). Where the purpose of a notice requirement is met by actual knowledge, actual knowledge suffices. *FDIC v. Jahner*, 506 N.W.2d 57, 63 (N.D.1993). *See also First Security Bank of Utah, N.A. v. Wright*, 521 P.2d 563, 565 (Utah 1974)

[assuming financing statement did not contain adequate description of property on which crop was grown, subsequent creditor with actual knowledge of prior creditor's security interest could not defeat that interest]; *United States v. Newcomb*, 682 F.2d 758, 762 (8th Cir.1982) [less degree of certainty required when adequacy of description is challenged by creditor with some knowledge of the land at issue].

█ In this case, the misdescriptions were not seriously misleading to the Thompsons, the relevant third parties. Gene Thompson acknowledged, and the trial court found, when Jean Thompson provided him a copy of the financing statement she had discovered, he knew the Bank had a security interest in all of the tracts the joint venture was farming. The Danners and Thompsons were family. They had rental relationships with each other on previous occasions and two of the three misdescribed tracts were owned by the Danners. The Thompsons obviously had some knowledge of the Danners' farming operation and the general area and would have noticed an inconsistency between the description and the listed owner. Under these circumstances, we conclude the trial court did not err in determining the misdescriptions did not render the security agreement and financing statement ineffective against the claims of the Thompsons and the joint venture.

We have reviewed the other arguments of the parties and they do not affect our decision.

The judgments are affirmed.

VANDE WALLE, C.J., and NEUMANN, LEVINE and MESCHKE, JJ., concur.