**In re Donald ARITHSON & Kathleen Arithson, Debtors.**

**Phillip D. ARMSTRONG, Trustee of the Estate of Donald Arithson and Kathleen Arithson, Plaintiff,**

v.

**DAKOTA WESTERN BANK OF BOWMAN, Defendant.**

Bankruptcy No. 92–30182.
Adv. No. 94–7012.

United States Bankruptcy Court, D. North Dakota.

Sept. 12, 1994.

Phillip D. Armstrong, Trustee, Minot, ND.

Lawrence Dopson, Bismarck, ND, for Dakota Western Bank.

## MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Chapter 7 Trustee, Phillip D. Armstrong (Trustee), commenced the above-entitled action by Complaint filed on February 17, 1994, seeking to avoid the security interests given by the debtors to Dakota Western Bank of Bowman (Bank) in specified CRP payments and oil royalty payments.[1] The Trustee essentially asserts that the Bank's security interests in the aforementioned items of collateral are unenforceable and inferior to the trustee's status in bankruptcy as a hypothetical lien creditor since it failed perfect the security interests in accordance with state law. The Bank maintains that its security interests in the CRP and oil royalty payments were properly perfected and that its interest in the payments is therefore immune from the trustee's attack under Section 544(a) of the United States Bankruptcy Code.

The essential facts of this controversy are undisputed. Consequently, the parties have waived a trial on the merits and the issues before the court have been submitted by the parties for resolution on the pleadings, stipulated facts, and documents of record. A stipulation of facts was jointly executed by the parties and filed on July 18, 1994. The material facts as gleaned from the joint stipulation and submitted documents are as follows:

## FINDINGS OF FACT

On May 11 and 12, 1981, the debtors Donald and Kathleen Arithson, along with Donald's brother and his wife (collectively the Arithsons), executed two mortgages in favor of the Federal Land Bank Association. The mortgages conveyed an interest in real prop-

---

1. The parties to this dispute have resolved, by stipulation, the other matters of contention as set forth in the Complaint.

erty located in North Dakota and South Dakota as security for indebtedness.

On January 21, 1986, the Arithsons executed two real estate mortgages in favor of the defendant, Dakota Western Bank of Bowman, again conveying an interest in the North Dakota and South Dakota real estate as security for the indebtedness. The defendant paid off the Arithson's 1981 loan on June 29, 1988, and thereby acquired Federal Land Bank's mortgage interest by virtue of an assignment. The aggregate indebtedness was restructured and the Bank received two replacement mortgages.

The Arithsons later conveyed their equitable interest in the mortgaged property to a number of individuals by virtue of various contracts for deed. The Stearns Ranch, Inc. was one of the contract vendees who acquired an equitable interest in a parcel of realty on April 24, 1989. The contract between the Arithsons and the Stearns Ranch, Inc. was assigned to the Dakota Western Bank of Bowman on the same day. The Bank recorded the assignment in the real estate records of the Bowman County Register of Deeds on May 10, 1989.

The specific terms of the contract with the Stearns Ranch, Inc. provided that the Arithsons would receive all CRP payments from the subject property. The April 24, 1989 agreement, which contained the assignment of the contract for deed in favor of the Bank, included an assignment of the Arithsons' interest in all CRP payments. The agreement was executed by the Arithsons and by two Bank officers. In addition to referencing the contract for deed with the Stearns Ranch, Inc. and providing a legal description of the encumbered realty, the agreement provided in pertinent part that:

> It is specifically acknowledged that the assignment of the Contract for Deed shall include the assignment by the Arithsons to the Bank of all CRP payments payable to the Arithsons pursuant to the provisions of said Contract for Deed.

> In the event of any default in payment to the Bank of the annual CRP payments provided for in the Contract for Deed, the Bank, by virtue of the assignment of the Contract for Deed, shall have the right to the rents and profits from that real estate designated as CRP land in the Contract for Deed. . . .

> For the purposes of this Agreement a default shall include any failure by the Arithsons to pay to the Bank any CRP payment within 15 days of its receipt by the Arithsons; the discontinuation of the CRP program or any reduction of the benefits thereof to appoint where the annual amounts to be received from the leased premises total less than $17,787.00. . . .

Exhibit C3. A UCC–1 financing statement together with a copy of the actual agreement with the Bank setting forth the assignment was filed on April 26, 1989, with the Bowman County Register of Deeds. *See* Exhibit C4. The UCC–1 financing statement specifically referenced the attached agreement. The financing statement was refiled on October 17, 1993.

At the time of the April 24, 1989 agreement, the Arithsons' outstanding indebtedness was restructured to include a promissory note which recited that is was secured by the assignment of CRP payments. The annual payment on the note was equal to the amount of the annual CRP payment as calculated by referencing the express provisions of Arithsons' contract with the U.S. Department of Agriculture. *See* Exhibits C5 & C6. The annual CRP payments were paid to the Bank until 1992. The ASCS office has retained the payments for the 1992 and 1993 crop years.

On February 4, 1991, the Arithsons executed a promissory note. *See* Exhibit D1. As security for the outstanding indebtedness, the Arithsons executed a "Mortgage, Security Agreement and Assignment of Production" (Mortgage). *See* Exhibit D2. The Mortgage was recorded in the real estate records of the Bowman County Register of Deeds and the Harding County, South Dakota, Register of Deeds on February 8, 1991. By virtue of the Mortgage, the Arithsons granted the Bank a security interest in a number of oil and gas related assets including the working interest in oil and gas leases, all oil and mineral interests, and any royalty or production payments (collectively the col-

lateral). *Id.* at 1. The Mortgage contained an assignment of production and was executed to secure the payment and performance of the obligations under the promissory note. The moneys received under the Mortgage were applied toward the outstanding indebtedness. Upon full satisfaction of the indebtedness, the Bank's rights and interest in the collateral are to terminate and revert to the Arithsons.[2] In the event of default, however, the Bank is entitled to exercise all the rights and remedies available to a mortgagee under applicable law and a secured party under the Uniform Commercial Code. The Bank has been receiving regular royalty payments owed to the Debtors by developers of the mineral interests.

The debtors filed for relief under Chapter 7 of the United States Bankruptcy Code on February 21, 1992. On May 28, 1992, the court granted the debtors a discharge.

### CONCLUSIONS OF LAW

■ Section 544(a) of the United States Bankruptcy Code, commonly referred to in bankruptcy parlance as the "strong-arm clause", vests a trustee with the status of a hypothetical lien creditor without knowledge, giving it rights paramount to the holder of an unperfected security interest. *Kingsley v. First American Bank (In re Kingsley)*, 865 F.2d 975, 977 n. 2 (8th Cir.1989); *Branderhorst v. Central Iowa Production Credit Ass'n (In re Branderhorst)*, 843 F.2d 311, 312 (8th Cir.1988). A trustee, by virtue of § 544(a), is armed with the power to avoid any unperfected security interest. When a security interest is avoided under § 544(a), the creditor is treated for bankruptcy purposes as an unsecured creditor.

■ A bankruptcy trustee's powers to avoid encumbrances on estate property are, however, derivative; consequently, the extent of a trustee's powers as a hypothetical lien creditor are defined by substantive state law. *See Norwest Bank v. Bergquist (In re*

*Rolain)*, 823 F.2d 198, 199 (8th Cir.1987). Section 41–09–22 (U.C.C. § 9–301(1)(b)) of the North Dakota Century Code provides that an unperfected security interest is subordinate to the rights of a judicial lien creditor. N.D.Cent.Code § 41–09–22(1)(b) (1983). Consequently, a creditor must have a perfected security interest in the collateral in order to defeat the interest of a bankruptcy trustee. *First Nat'l Bank v. Turley*, 705 F.2d 1024, 1026 (8th Cir.1983).

■ Of significant import in this case is that a trustee's status as a judicial lien creditor and concomitant right to avoid unperfected security interests under § 544(a) vests or becomes fixed at "the commencement of the case". 11 U.S.C. § 544(a). Consequently, when ascertaining whether or not the Bank's security interests in the CRP payments and oil royalty payments were perfected in the instant case, the operative date is the date the bankruptcy petition was filed—February 21, 1992.

### CRP Payments

As previously set forth, the Bank recorded its security interest in the assignment of CRP payments by filing a UCC–1 financing statement and a copy of the agreement containing the assignment with the county register of deeds in the county where the real property was situated. The Trustee charges that by filing in the register of deeds office, the Bank filed in the wrong place. The Trustee asserts that CRP payments are in the nature of "general intangibles" or "contract rights" and thus contends that the proper place to file in order to perfect a security interest in the CRP payments under the governing statute was in office of the secretary of state. The Bank retorts by arguing that CRP payments are in the nature of "rents" which essentially run with the land and therefore should be perfected by recording in the county real estate records or in the county register of deeds.

2. The Mortgage provides in pertinent in part that:

 If all of the Obligations shall be paid in full pursuant to the terms and conditions of this instrument and the instruments evidencing the Obligations, and if Debtor shall have well and

truly performed all of the covenants herein contained, then this instrument shall become null and void, all of the Collateral shall revert to Debtor, the entire right, title and interest of Secured Party shall terminate....
Exhibit D2, at 8.

Although it should be parenthetically noted that courts are not altogether uniform on the issue of whether government payments such as CRP payments are in the nature of real estate interests such as "rents" or more properly classified as "general intangibles", this court finds it unnecessary to resolve the question in the instant case. *See generally,* Steven C. Turner & Dawnvolynn D. Callahan, *The Nature Treatment, and Classification of Security Interests in Government Farm Payment Programs and Related Issues,* 10 J. Agricultural Tax'n & Law 195 (1988). The Trustee's reliance on the 1983 version of the North Dakota Century Code (U.C.C.), which draws a distinction for purposes of filing between real estate transactions (i.e. rents) which should be recorded in the county real estate records and other interests (i.e. general intangibles) which should be recorded in the office of the secretary of state, is misplaced. *See generally,* N.D.Cent.Code § 41–09–40 (U.C.C. § 9–401) (1983). The governing provision, Section 41–09–40 of the North Dakota Century Code, was amended in 1991 to provide that financing statements covering collateral such as the CRP payments in question could be filed in *either* the county office of the register of deeds *or* in the office of the secretary of state. N.D.Cent.Code § 41–09–40 (U.C.C. § 9–401) (Supp.1993). Since the effective date of the amended provision was January 1, 1992, one month *prior* to the debtor's Chapter 7 filing, the provision the Trustee in this case relies on was superseded. *See* 1991 N.D.Laws ch. 449 § 14. The statutory amendment was brought about due to the fact that computerization made a centralized notice system possible and thus enabled local filings to be picked up by the office of the secretary of state. In order to effectuate the statutory change in the filing requirements and provide for a centralized filing system, it was necessary for secured creditors to refile their financing statements and supporting documents in *either* the office of the secretary of the state *or* the county register of deeds. *See* N.D.Cent.Code § 41–09–28.1 (Supp.1993). A six-month window, January 1, 1992 to June 30, 1992, was afforded creditors in which to refile their financing statements. Any security document originally filed before January 1, 1992, which was not refiled would lapse on June 30, 1992. *Id.* During the six-month window, however, it was necessary for the filing officer to conduct a search of two sources—*both* the office of the secretary of state *and* the local filing office records. *See* Secretary of State's Re-Filing Procedures, Bulletin # 4. Consequently, the governing statute essentially had retroactive effect during the six-month window for all financing statements originally filed prior to January 1, 1992, and it did not matter for purposes of perfection whether the Bank filed in the county register of deeds office. Although the Bank did not refile during the six-month window and its financing statement apparently lapsed on June 30, 1992, the Trustee's status as a hypothetical lien creditor is not measured at that date. The Bank's security interest in the CRP payments was properly perfected.

The Trustee further challenges the Bank's perfected status by perfunctorily arguing that a security interest was never created in this case since there was never a security agreement between the debtors and the Bank which granted the Bank a security interest in the CRP payments. The court finds the Trustee's argument on this point to be without merit.

A "security agreement" is defined as "an agreement which creates or provides for a security interest." N.D.Cent. Code § 41–09–05(1)(m) (U.C.C. § 9–105) (Supp.1993). A "security interest" is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." N.D.Cent.Code § 41–01–11(37) (U.C.C. § 1–201(37)) (Supp.1993). Although "attachment" is a fundamental prerequisite to perfection and mandates comporting with certain formalities such as executing a security agreement, *see Thompson v. Danner,* 507 N.W.2d 550, 554 (N.D.1993), no specific words or precise form are required to create a security agreement. *Nelson v. Cavalier Rural Elec. Co-op. (In re Axvig),* 68 B.R. 910, 918 (Bankr.D.N.D.1987); *Elhard v. Prairie Distributors, Inc.,* 366 N.W.2d 465, 468 (N.D.1985). Moreover, certain transfers such as assignments which appear absolute in form may readily constitute

security agreements since courts will look to the substance of the transaction. James J. White & Robert S. Summers, *Uniform Commercial Code* § 22–3, at 969–70 (3d ed. 1988). *Accord* N.D.Cent.Code § 41–09–02 (U.C.C. § 9–102(1)(a)) (1983) (noting that Article 9 applies to "[a]ny transaction (regardless of its form) which is intended to create a security interest"); Uniform Commercial Code § 9–203 official cmt. 4. *See Artoc Bank & Trust v. Apex Oil Co. (In re Apex Oil Co.),* 975 F.2d 1365, 1369 (8th Cir.1992) (finding there to be no meaningful difference under the Uniform Commercial Code between a security interest and an assignment which is given·as security). *See, e.g., Mid–Eastern Electronics, Inc. v. First Nat'l Bank,* 455 F.2d 141, 146 (4th Cir.1970) (finding an assignment of proceeds due under a government contract to constitute a security agreement); *George W. Ultch Lumber Co. v. Hall Plastering, Inc.,* 477 F.Supp. 1060, 1066 (W.D.Mo.1979) (finding the assignment of a contract right to create a security interest). In order to create a valid security agreement, the contracting parties must mutually assent to allowing a creditor, for value given, a special interest in the subject of the agreement in order to secure the payment of an obligation. A security agreement must usually be in writing and contain a debtor's signature as well as an adequate description of the collateral pledged to secure the indebtedness. A consideration critical to the determination of whether a valid security agreement exists is whether the language embodied in the particular writing objectively indicates that the parties intended to provide for a security interest. *See In re Paul,* 83 B.R. 709, 714 (Bankr.D.N.D.1988); *Coral Petroleum, Inc. v. Paribas (In re Coral Petroleum, Inc.),* 50 B.R. 830, 841 (Bankr.S.D.Tex.1985); *North Dakota Pub. Serv. Comm'n v. Valley Farmers Bean Ass'n,* 365 N.W.2d 528, 537 (N.D.1985). *See also Goldstein v. Madison Nat'l Bank,* 89 B.R. 274, 276 (D.D.C.1988) ("To determine whether the agreement at issue was a security or absolute assignment, the Court must search for the intent of the parties. This intent is to be discerned from the contents of the document[s] ... and the circumstances surrounding the transaction."). This court has no trouble in concluding that

the writing in the instant case was a security agreement which fully comported with the requisite formalities and that the parties fully intended that the Bank would have a security interest in the CRP payments. The fact that the agreement in this case was couched in the form of an assignment does not defeat the fundamental character of the transaction.

██ Finally, the Trustee urges that the applicable statutory framework and enabling government regulations preclude the assignment of the subject CRP payments unless the money advanced was made to finance the making of crop for the current crop year or necessary to perform a conservation practice. *See* 16 U.S.C.A. § 590g (1985). *See also* 7 C.F.R. § 709.3 (1989) (precluding the assignment of CRP payments to pay or secure preexisting indebtedness). The fundamental purpose of the regulatory provision which governs the assignment of claims "is to protect the *government* and prevent it from becoming embroiled in conflicting claims or subjected to multiple liability." *United States v. Crain,* 151 F.2d 606, 607 (8th Cir. 1945), *cert. denied,* 327 U.S. 792, 66 S.Ct. 817, 90 L.Ed. 1019 (1946) (emphasis added). Although courts are divided on whether the anti-assignment provisions contained in the federal regulatory provisions preempt state law and preclude the enforcement of security interests, this court believes that such anti-assignment provisions were not designed to upset commercial relationships created and defined by state law. Nowhere in the federal regulations governing CRP payments

is there the avowed congressional purpose of providing cash flow support to farmers at the expense of secured creditors through the destruction of security interests or other encumbrances that might attach to the proceeds of [government payments] under consensual lien agreements.... [S]uch provisions are merely for the administrative convenience of the federal government and are not meant to eradicate valid security interests or other types of perfected encumbrances.

*Eastern Colorado Bank v. Harvie (In re Harvie),* 84 B.R. 197, 201 (Bankr.D.Colo. 1988). *Cf. BFP v. Resolution Trust Corp.*

*(In re BFP),* —— U.S. ——, ——, 114 S.Ct. 1757, 1765, 128 L.Ed.2d 556, *reh'g denied,* —— U.S. ——, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994) (noting that any purpose to displace an area of traditional state regulation must be "manifest" and "clear"). The Eighth Circuit Court of Appeals has similarly concluded that such anti-assignment provisions in government programs do not preclude a farm program participant from agreeing to use program payments for security:

> These provisions merely govern the rights of parties claiming ... benefits directly from the federal government. They do not prevent one who is entitled to the benefits from pledging the benefits as security on loans properly made under state law. Simply because the government will refuse to deliver the benefits to an assignee not appearing on the proper federal forms does not mean that an assignor can totally disregard legal obligations to the assignee. Such "anti-assignment" provisions are intended to insulate the government as benefit provider from conflicting claims over payments, not to preempt state commercial law as between third parties. Neither do we read anything in [the] regulations to restrict program beneficiaries from voluntarily encumbering their ... benefits.

*In re Sunberg,* 729 F.2d 561, 563 (8th Cir. 1984) (citations omitted).[3] *Accord Security Bank & Trust Co. v. Case (In re George),* 85 B.R. 133, 139–43 (Bankr.D.Kan.1988), *aff'd,* 119 B.R. 800 (D.Kan.1990); *Farmers & Merchants Nat'l Bank v. Fairview State Bank,* 766 P.2d 330, 332–33 (Okla.1988). *Cf. Segal v. Rochelle,* 382 U.S. 375, 384, 86 S.Ct. 511, 517, 15 L.Ed.2d 428 (1966) (opining that the assignment of loss-carryback refunds received by the debtors from the federal government should be given effect as between the parties since the language of the anti-assignment statute "must be interpreted in light of its purpose to give protection to the Government"); *Martin v. National Surety Co.,* 300 U.S. 588, 594, 57 S.Ct. 531, 534, 81 L.Ed. 822 (1937) (ruling that the statute prohibiting assignments is for the protection of the government and does not preclude the enforcement of an assignment after the payments have been disbursed). "There is nothing incongruous in recognizing the validity of an assignment of a claim against the government as between the parties, and providing no remedy through the courts to enforce the assignment as against the government, thereby protecting the United States from double liability." *United States v. Crain,* 151 F.2d 606, 607 (8th Cir.1945), *cert. denied,* 327 U.S. 792, 66 S.Ct. 817, 90 L.Ed. 1019 (1946).

To allow a trustee or debtor-in-possession to use the anti-assignment provision of the federal regulations to avoid a security interest that is properly perfected under state law would undoubtedly restrict the availability of funds often crucial to the success of a farming operation. Such an interpretation would have a fundamental impact on the ability of debtors who participate in federal farm programs to finance a farm operation or restructure their obligations. Government entitlements such as CRP payments may, in many cases, be the only unencumbered asset a farmer may have available to pledge as security. The court declines to override intricate state law of general applicability to secured transactions on which both debtors and creditors base their daily commercial transactions. Moreover, it is significant to note that the federal regulations governing CRP payments appear to have been recently amended to freely permit such assignments without regard to whether the financing was given to restructure preexisting indebtedness. *See* 16 U.S.C.A. § 590g (Supp.1994). *See also* 7 C.F.R. §§ 701.84, 704.18, 1404.1, 1404.3 (1994). *Cf.* 59 Fed.Reg. 360, 361 (Jan. 4, 1991).

---

**3.** As previously intimated, this court is fully aware that courts which have considered the issue are divided on whether the federal regulations cited above preempt state commercial law and that the Eighth Circuit in *In re Sunberg* reviewed federal regulations which differed from those presented in the case at bar. *See, e.g.,* *Adams Bank & Trust v. McQuillan & Spady, P.C. (In re Curry),* 113 B.R. 546, 550 (D.Neb.1990). However, the unmistakable import of the *Sunberg* decision can be gleaned from the court's reluctance to supplant state law by upsetting consensual commercial relationships.

**322**

### Oil Royalty Payments

The parties to this action dispute whether or not the Uniform Commercial Code (UCC) governs the perfection of a secured creditor's interest in payments flowing from extracted oil. Simply put, it does.

 Article 9 of the UCC governs the creation and enforceability of "any transaction (regardless of its form) which is intended to create a security interest in *personal property* or fixtures *including goods....*" N.D.Cent.Code § 41–09–02 (U.C.C. § 9–102(1)(a)) (1983) (emphasis added). With the exception of fixtures, excluded from Article 9 are transactions aimed at "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder." *Id.* § 41–09–04 (U.C.C. § 9–104(10)). Under North Dakota law, an oil, gas, and mineral lease, or any assignment thereof, is a grant of an estate in real property and will, for the most part, be governed by real estate law rather than the rules set forth in Article 9 of the UCC. *Petroleum Exchange, Inc. v. Poynter,* 64 N.W.2d 718, 722 (N.D.1954). *Accord Federal Deposit Ins. Corp. v. Hulsey,* 22 F.3d 1472, 1484 (10th Cir.1994). Similarly, a landowner's mineral estate or interest in unextracted oil and gas, even when split away from the surface estate, is an interest in real estate and governed by the law of real estate mortgages. *See, e.g., Messersmith v. Smith,* 60 N.W.2d 276 (N.D.1953). At the moment of extraction or severance from the subsurface estate, however, mineral interests immediately transform from realty into personalty and become subject to the requirements of Article 9. James J. White & Robert S. Summers, *Uniform Commercial Code* § 22–25, at 1069 (3d ed. 1988). *Accord Northern Trust Co. v. Buckeye Petroleum Co., Inc.,* 389 N.W.2d 616, 620 (N.D.1986). There thus exists a pre- and post-extraction dichotomy for perfecting a security interest in minerals such as oil and gas. The framers of Article 9 of the UCC recognized this distinction. As set forth above, secured transactions included within the governing framework of Article 9 are interests in personal property such as "goods". N.D.Cent.Code § 41–09–02 (U.C.C. § 9–102(1)(a)) (1983). The definition of "goods" set forth in § 9–

105(1)(h) specifically *excludes* mineral interests such as oil and gas *prior to extraction* from the ambit of Article 9. *Id.* § 41–09–05 (U.C.C. § 9–105(1)(h)). By negative implication, an interest in oil and gas *after extraction* falls within the definition of "goods" and the purview of Article 9. *Jones v. Salem Nat'l Bank (In re Fullop),* 6 F.3d 422, 428 (7th Cir.1993); *Octagon Gas Sys., Inc. v. Rimmer (In re Meridian Reserve, Inc.),* 995 F.2d 948, 954–55 (10th Cir.), *cert. denied,* ── U.S. ──, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993); Barkley Clark, *The Law of Secured Transactions under the Uniform Commercial Code* ¶ 13.3[1], at 13–9 (1980). *See* N.D.Cent.Code §§ 41–09–03(5) (U.C.C. § 9–103(5)), 41–09–40(1)(b) (U.C.C. § 9–401(1)(b)), 41–09–41(5) (U.C.C. § 9–402(5)), 41–09–42(7) (U.C.C. § 9–403(7)) (1983) (provisions acknowledging the distinction between mineral interests prior to and following extraction by setting forth rules for perfection for extracted minerals as referenced in U.C.C. § 9–105(1)(h)). Therefore, any proceeds flowing from the production of extracted gas and oil is likewise considered personal property governed by Article 9. *Northern Trust Co. v. Buckeye Petroleum Co., Inc.,* 389 N.W.2d 616, 620 (N.D.1986). *Cf.* N.D.Cent.Code § 41–09–27 (U.C.C. § 9–306(1)) (1983).

 In North Dakota, the county clerk's office (office of the register of deeds) typically has separate filing/recording systems for personal and real property. Since Article 9 of the UCC applies to security interests in minerals such as oil and gas upon extraction as well as accounts or proceeds from the sale thereof, the Bank's security interest must fulfill the perfection requirements of Article 9 in order to escape the Trustee's "strong arm" powers. The Trustee argues that by filing its mortgage documents solely in the real estate records of the counties in which the wellheads are located, the Bank failed to properly perfect its security interest in the royalty payments. Since the proceeds from extracted oil and gas are goods or personalty subject to Article 9, the Trustee contends that the UCC mandates that the financing statement should have been filed or indexed *both* in the chattel records of the county in

which the wellheads are located as well as recorded in the real estate records. This court does not agree.

 Issues regarding the proper place to file always begin with UCC § 9–401. The governing version of UCC § 9–401(1) provides that—

1. The proper place to file in order to perfect a security interest is as follows:

a. When the collateral is crops growing or to be grown, timber to be cut, or is *minerals or the like (including oil and gas), or accounts subject to subsection 5 of section 41–09–03 [ (U.C.C. § 9–103(5)) ]*, or when the financing statement is filed as a fixture filing (section 41–09–34) and the collateral is goods which are or are to become fixtures, *then in the office where a mortgage on the real estate concerned would be filed or recorded.*

b. In all other cases, in the office of the register of deeds in any county in this state or in the office of the secretary of state.

N.D.Cent.Code § 41–09–40 (U.C.C. § 9–401) (Supp.1993) (emphasis added). *See id.* § 41–09–40(1)(b) & (c) (U.C.C. § 9–401(1)(b) & (c)) (1983). *See also* 1991 N.D.Laws ch. 449 § 14 (effective date of the 1993 version of the UCC was January 1, 1992). Since § 9–401(1)(a) specifically references UCC § 9–103(5), it is readily apparent that this provision is integral to the perfection requirements of minerals interests such as those stemming from the production of oil and gas. Section 9–103(5) provides:

Minerals. Perfection and the effect of perfection or nonperfection of a security interest which is created by a debtor who has an interest in minerals or the like (including oil and gas) before extraction and which attaches thereto as extracted, or which attaches to an account resulting from the sale thereof at the wellhead or minehead are governed by the law (including the conflict of law rules) of the jurisdiction wherein the wellhead or minehead is located.

N.D.Cent.Code § 41–09–03(5) (U.C.C. § 9–103(5)) (Supp.1993). When construed together, §§ 9–401(1)(a) and 9–103(5) telescope perfection questions regarding various interests in minerals and the like to the state and county where the wellhead is located. White & Summers, *supra* § 22–25, at 1069. The official comments to the UCC make it clear that the purpose of the two sections is to make filings and searches in cases involving classes of collateral related to extracted minerals (whether in the form of inventory, accounts, contract rights, or proceeds from production) uniform and predictable:

Subsection (5) deals with problems relating to the financing of minerals (including oil and gas) as those products come from the ground. In some cases rights in oil and gas in the ground have been split into a large variety of interests. As the oil or gas issues from the ground, it may be encumbered by the group of persons having interests therein. Or the product may be sold at the minehead or wellhead and any the resulting accounts assigned. The question arises as to the place of filing. The usual rule of this section in subsection (2) would make the place to search for encumbrances on the account the locations of the respective assignors; but the assignors might be a number of individuals located throughout the country. *To avoid the difficult problems of search thus created, subsection (5) provides that the place for filing with respect to security interest in the minerals as they issue from the ground at the minehead or wellhead or in the accounts arising out of the sale of the minerals at the minehead or wellhead shall be in the state where the minehead or wellhead is located. Section 9–401 similarly provides that the place to file within the state is in the real property records in the county where the minehead or wellhead is located.*

Uniform Commercial Code § 9–103 official cmt. 8 (emphasis added). "This relieves the creditor from the central and perhaps other local filings typically required for ordinary inventory and accounts, not only in the state of mineral operations but in other states where debtors may be scattered." White & Summers, *supra* § 22–25, at 1069. *See* Fred C. Rathert, *Use of the Model Form Agreement for the Creation and Enforcement of a Security Interest,* 62 N.D.L.Rev. 197, 209

(1986) (noting that the purpose of UCC § 9–401(1)(b), currently at § 9–401(a), "is to ensure that any security interest in oil and gas is disclosed by a search of the real estate records covering the contract area.").

■■■ The UCC attempts to simplify filing requirements by eliminating a multiple filing or indexing requirement for the majority of various mineral interests and specifically designating one location—the county *real estate* records—as the place to perfect a security interest in extracted minerals and payments flowing therefrom. Any other interpretation would ignore the plain distinction drawn between subsections (a) and (b) of UCC § 9–401(1), especially since the county clerk's office or the office of the register of deeds maintains separate recording systems for chattel filings and real estate recordations.

The Trustee cites UCC § 9–403(7) as support for the position that the mineral interests in question should be filed in the UCC records of the county in which the wellheads are located. This position is simply not tenable. Section 9–403(7) clearly provides that the *location* for filing or indexing a financing statement for extracted mineral interests is in the county real estate records. *See* N.D.Cent.Code § 41–09–42(7) (U.C.C. § 9–403(7)) (Supp.1993) (requiring the filing officer to record and index a financing statement covering mineral interests and accounts subject to UCC § 9–103(5) "in the same fashion as if the financing statement were a mortgage of the real estate described.").

■■■ Although the Trustee correctly points out that UCC §§ 9–402(5) and 9–403(7) clearly contemplate that a security interest in extracted oil and gas be perfected by the filing of a "financing statement" containing specific information, *see id.* § 41–09–41(5) (U.C.C. § 9–402(5)), a properly drafted security agreement can serve as a financing statement. *Id.* § 41–09–41(1) (U.C.C. § 9–402(1)). In short, a review of the security agreement and supporting documentation filed in the real estate records leads this court to conclude that they amply satisfy the UCC requirements.

Accordingly, and for reasons stated, the Bank's security interests in specified CRP and oil royalty payments are properly per-

fected and therefore not subject to avoidance under 11 U.S.C. § 544(a). **IT IS ORDERED** that judgment be entered in favor of the defendant, Dakota Western Bank of Bowman, and against the plaintiff, Phillip D. Armstrong, Trustee of the Estate of Donald Arithson and Kathleen Arithson dismissing the Complaint of the plaintiff-trustee.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**