## 2016 ND 20

**PHI FINANCIAL SERVICES, INC., Plaintiff, Appellee, and Cross–Appellant**

**v.**

**JOHNSTON LAW OFFICE, P.C., Defendant, Appellant, and Cross–Appellee**

**and**

**Choice Financial Group, Defendant, Appellee, and Cross–Appellant**

### No. 20150008.

Supreme Court of North Dakota.

Jan. 26, 2016.

Rehearing Denied Mar. 28, 2016.

Jon R. Brakke (argued) and Neil J. Roesler (on brief), Fargo, N.D., for plaintiff, appellee, and cross-appellant.

DeWayne A. Johnston (argued), Grand Forks, N.D., defendant, appellant, and cross-appellee; self represented.

David C. Thompson (appeared), Grand Forks, N.D., for defendant, appellant, and cross-appellee.

Richard P. Olson (argued) and Wanda L. Fischer (on brief), Minot, N.D., for defendant, appellee, and cross-appellant.

CROTHERS, Justice.

[¶ 1] Johnston Law Office, P.C. ("Johnston") appeals, and PHI Financial Services, Inc. and Choice Financial Group cross-appeal from a judgment awarding PHI $167,203.24 plus interest from Johnston in PHI's action to recover damages for a fraudulent transfer. We affirm in part, reverse in part and remand for further proceedings.

I

[¶ 2] In 2007 Thomas and Mari Grabanski and John and Dawn Keeley formed Keeley Grabanski Land Partnership for the purpose of purchasing land in Texas. In 2008 the Grabanskis and Keeleys formed G & K Farms ("G & K"), a North Dakota general partnership, for the purpose of farming the Texas land. G & K was insured under the Supplemental Revenue Assistance Payments Program ("SURE"), which is administered by the Farm Service Agency of the United States Department of Agriculture and provides financial assistance for crop losses caused by natural disasters.

[¶ 3] In 2007 and 2008 Choice made a series of loans totaling more than $6.75 million to the Grabanskis and the Keeleys on behalf of G & K. Choice entered into a number of security agreements with G & K and its principals to secure the debt.

Among other things, the security agreements granted Choice a security interest in:

"GOVERNMENT PAYMENTS AND INSURANCE PAYMENTS. ALL OF DEBTOR'S NOW EXISTING OR HEREAFTER ACQUIRED RIGHT, TITLE AND INTEREST IN AND OR RIGHT TO RECEIVE ANY PAYMENTS, WHETHER IN CASH, CROPS, OR FARM PRODUCTS FROM OR THROUGH ANY FEDERAL OR STATE GOVERNMENT AGENCY OR PROGRAM, INCLUDING, WITHOUT LIMITATION, ANY PROGRAMS BY OR THROUGH THE COMMODITY CREDIT CORPORATION OR THE FARM SERVICE AGENCY SUCH AS PAYMENTS IN KIND, DEFICIENCY PAYMENTS, LETTERS OF ENTITLEMENT, WAREHOUSE RECEIPTS, STORAGE PAYMENTS, DIVERSION PAYMENTS, DISASTER PAYMENTS, DEFICIENCY PAYMENTS, CONVERSION RESERVE PAYMENTS, CLDAP PAYMENTS, MLA PAYMENTS, AND ALL PRODUCTS AND PROCEEDS THEREOF."

Between March 2007 and February 2008 Choice filed the appropriate UCC financing statements with the Texas Secretary of State, the state where G & K's crops were growing.

[¶ 4]   In 2008 PHI loaned $6.6 million to G & K, the Grabanskis and their various other business entities. PHI entered into security agreements with the debtors which included a provision granting it a security interest in:

*General Intangibles:* All general intangibles including, but not limited to, tax refunds, applications for patents, patents, copyrights, trademarks, trade secrets, good will, trade names, customer lists, permits and franchises, all state or federal farm program payments of any nature and the right to receive such payments including, but not limited to, Conservation Reserve Program Payments, Feed Grain Program Payments and Disaster Relief Program Payments."

In September 2008 PHI filed financing statements with the North Dakota Secretary of State, the state in which the debtors were located. In December 2008 and June 2009 Choice filed financing statements with the North Dakota Secretary of State.

[¶ 5]   G & K suffered $2.5 million in losses during 2008, but proceeded to plant crops on the property again in 2009. The Keeleys withdrew from G & K in early 2009. The Grabanskis then formed a new partnership, Texas Family Farms, to farm the property. The Grabanskis and their business entities eventually defaulted on their loans. Johnston represented the Grabanskis in personal bankruptcy proceedings initiated in 2010, and represented them and their business entities during the following two years in numerous lawsuits stemming from the bankruptcy. In March 2011 PHI obtained a judgment for approximately $7.5 million against the Grabanskis and G & K in the United States District Court for the District of North Dakota. In October 2011 G & K received a SURE payment of $328,168 from the federal government for 2009 crop losses. The Grabanskis did not deposit the disaster payment in G & K's North Dakota bank account with Choice because Johnston advised them that Choice would offset the funds against G & K's debt to Choice. On October 11, 2011 G & K deposited the SURE payment in a new Texas bank account. The Grabanskis then transferred $170,400 of the SURE payment from the Texas bank account to Johnston's law office trust account

through two transactions. The first check for $150,000, dated October 11, 2011, was for Johnston's attorney fees. The second check for $20,400, dated October 27, 2011, was sent with instructions to forward the money to Tom Grabanski's father, Merlyn Grabanski, to indemnify him for monies paid on behalf of G & K the previous year. Johnston transferred $24,225.37 from the trust account to Merlyn Grabanski and retained the remaining $145,774.63 for legal fees.

[¶ 6] PHI brought this action against Johnston seeking to recover $170,400 based on theories of conversion and fraudulent transfer. PHI later added Choice as a defendant to determine priority of the competing security interests. The district court granted summary judgment ruling PHI's security interest had priority over the security interest held by Choice. Following a bench trial the court ruled the $24,225.37 transferred to Tom Grabanski's father was a fraudulent transfer and PHI was entitled to recover that amount from Johnston. The court also found the $150,000 payment was fraudulent, but found G & K received reasonably equivalent value for the transfer. The court allowed Johnston to retain $35,000 of the remaining funds, which the court found equaled the value of legal services provided to G & K, but voided the remaining $115,000. A judgment with interest totaling $167,203.24 was entered in favor of PHI.

## II

[¶ 7] "Before we consider the merits of an appeal, we must have jurisdiction." *Choice Fin. Grp. v. Schellpfeffer*, 2005 ND 90, ¶ 6, 696 N.W.2d 504. Because a final judgment was entered in this case, we treat Johnston's appeal from the memorandum and order for judgment and Choice's cross-appeal from the order denying motions for summary judgment as appeals from the subsequently entered consistent judgment. *E.g., Entzel v. Moritz Sport and Marine*, 2014 ND 12, ¶ 5, 841 N.W.2d 774. Johnston argues Choice's appeal from the order denying summary judgment and determining priority is untimely because it was not filed within 60 days of entry of the order. We reject the argument because the nonappealable interlocutory order is reviewable as a timely appeal from a final judgment. *E.g., Security State Bank v. Orvik*, 2001 ND 197, ¶ 6, 636 N.W.2d 664. We conclude we have jurisdiction to consider the issues raised in these appeals.

## III

[¶ 8] Johnston argues the district court erred in holding it liable for any part of the $170,400 the law firm received from G & K's Texas bank account.

[¶ 9] Under the Uniform Fraudulent Transfer Act, N.D.C.C. ch. 13–02.1, creditors have various remedies to avoid fraudulent transfers. *See Watts v. Magic 2 × 52 Mgmt., Inc.*, 2012 ND 99, ¶ 18, 816 N.W.2d 770; *Four Season's Healthcare Ctr., Inc. v. Linderkamp*, 2013 ND 159, ¶ 23, 837 N.W.2d 147. Section 13–02.1–04(1), N.D.C.C., provides:

"1. A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

a. With actual intent to hinder, delay, or defraud any creditor of the debtor; or

b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was engaged or was about to engage in a business or a transac-

tion for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Section 13–02.1–05(1), N.D.C.C., further provides that "a debtor's transfer of property is constructive fraud as to a creditor if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time of, or became insolvent as a result of, the transfer." *Estate of Bergman,* 2004 ND 196, ¶ 10, 688 N.W.2d 187. In *Farstveet v. Rudolph,* 2000 ND 189, ¶ 23, 630 N.W.2d 24, this Court further explained:

"Constructive fraudulent transfers are established conclusively, without regard to the actual intent of the parties, when they concur as provided in N.D.C.C. § 13–02.1–05. UFTA § 4, cmt. (5). 'To void a transfer under this section the following elements must be established: (1) The creditor's claim arose before the transfer; (2) the transfer was made to an insider; (3) the transfer was made for an antecedent debt; (4) the debtor was insolvent at the time; and (5) the insider had reasonable cause to believe the debtor was insolvent.' "

(Internal citation omitted.)

[¶ 10] Questions regarding actual or constructive fraudulent transfers are questions of fact subject to the clearly erroneous standard of review. *See Farstveet,* 2000 ND 189, ¶ 20, 630 N.W.2d 24. "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all of the evidence, this Court is convinced a mistake has been made." *Moody v. Sundley,* 2015 ND 204, ¶ 9, 868 N.W.2d 491.

## A

[¶ 11] Johnston argues the district court erred in voiding the $24,225.37 it transferred from its law office trust account to Tom Grabanski's father upon the direction of the Grabanskis.

[¶ 12] In voiding this transfer, the district court reasoned:

"DeWayne Johnston testified unequivocally that the October 27, 2011 transfer to Johnston Law from G & K was intended from the start to be forwarded to Merlyn Grabanski. Johnston Law was merely the conduit for the transfer of $20,400 to Merlyn Grabanski. The transaction bears all the elements of a fraudulent transfer, and is precisely the sort of insider transaction the statute is intended to prevent."

[¶ 13] Section 13–02.1–08(2), N.D.C.C., provided that "[t]he judgment may be entered against the first transferee of the asset or the person for whose benefit the transfer was made or any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee." Because the district court found the transfer was for the benefit of Tom Grabanski's father, Johnston could be liable only as a "first transferee." Johnston relies on a long line of cases decided under 11 U.S.C.A. § 550(a)(1) of the Bankruptcy Code, which hold the similar term "initial transferee" does not include entities that act as a "mere conduit" of the funds. *See, e.g., In re Ogden,* 314 F.3d 1190, 1196 (10th Cir.2002); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 130 F.3d 52, 55–58 (2d Cir.1997); *Matter of Coutee,* 984 F.2d 138, 140–41 (5th Cir.1993); J. Theuman, Annot., *What constitutes "initial transferee" under § 550(a) of bank-*

*ruptcy code, which permits recovery of property, or value thereof, from initial transferee of property to extent transfer is avoided,* 92 A.L.R. Fed. 631 (1989), and cases collected therein. These courts reject the notion that "the first entity to touch the disputed funds" is automatically the "initial transferee" and refuse to "equate[ ] mere receipt with liability." *Finley,* at 56, 57. Rather, "[u]nder this test, a party that receives a transfer directly from the debtor will not be considered the initial transferee unless that party gains actual dominion or control over the funds." *Coutee,* at 141. " '[T]he minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes.' " *Finley,* at 57 (quoting *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890, 893 (7th Cir.1988)). PHI argues the "mere conduit" line of cases is irrelevant under the Uniform Fraudulent Transfer Act because this rule is limited to bankruptcy cases.

[¶ 14] The equivalent of N.D.C.C. § 13–02.1–08(2) is found in § 8(b) of the Uniform Fraudulent Transfer Act. *See* 7A Part II U.L.A. 178 (2006). Comment (2) to that section of the Uniform Act states, "Subsection (b) is derived from § 550(a) of the Bankruptcy Code." *Id.* at 179. Recognizing the derivation of subsection (b), courts have relied upon the "mere conduit" cases decided under the Bankruptcy Code in interpreting the "first transferee" provision of their fraudulent transfer acts. *See Gellatly Petroleum v. Atlantic Techs., Ltd.,* 1995 WL 604461, at *3, *4 (Conn.Super.Ct. Oct. 5, 1995); *Newsome v. Charter Bank Colonial,* 940 S.W.2d 157, 164–66 (Tex.Ct.App.1996). "In construing a statute derived from a uniform act, we seek 'to effectuate its general purpose to make uniform the law of those states which enact it.' " *Farstveet,* 2000 ND 189, ¶ 19, 630 N.W.2d 24 (quoting N.D.C.C. § 1–02–13).

The "mere conduit" cases decided under the Bankruptcy Code are helpful in analyzing the issue here.

[¶ 15] It is undisputed that G & K, the Grabanskis and their business entities were Johnston's clients and that the disputed funds were placed in Johnston's law office trust account. "Client funds must be held in a trust account to ensure their safekeeping from loss and to maintain ready availability to the client upon termination of the representation. N.D.R. Prof. Conduct 1.15(a) and (d)." *Disciplinary Bd. v. Kellington,* 2011 ND 241, ¶ 14, 809 N.W.2d 298 (Crothers, J., dissenting). As we explained in *Disciplinary Bd. v. McDonagh,* 2013 ND 20, ¶ 14, 826 N.W.2d 622:

> "Simply put, money paid by a client to a lawyer belongs to someone—the client, the lawyer, or a third party. Money belonging to the client or a third party must be held in a trust account. N.D.R. Prof. Conduct 1.15(a). Money belonging to the lawyer cannot be deposited in the trust account, except to pay certain banking fees. N.D.R. Prof. Conduct 1.15(b). 'All property that is the property of clients or third persons, including potential clients, must be kept separate from the lawyer's business and personal property.' N.D.R. Prof. Conduct 1.15 cmt. 1."

A law firm is not free to put monies deposited in a client trust account to its own use. *See, e.g., Disciplinary Bd. v. Lawler,* 2014 ND 110, ¶¶ 4–8, 847 N.W.2d 127; *Disciplinary Bd. v. Boughey,* 1999 ND 205, ¶¶ 3–4, 602 N.W.2d 268.

[¶ 16] Application of the "mere conduit" rule in relation to a law firm's trust account is illustrated by *Coutee,* 984 F.2d 138. There, a law firm received a client's check in satisfaction of a judgment, deposited the funds into its trust account and

transferred part of the funds to a bank in satisfaction of the clients' loan. *Id.* at 140. The court reasoned:

"As the district court noted, the funds were deposited into the firm's trust account, as opposed to its business account, indicating that they were held merely in a fiduciary capacity for the Coutees. Moreover, the negotiations regarding the firm's legal fees, which occurred after it received the funds, indicate that the firm was not free at that time simply to keep the money. The only control exercised over the funds was the control delegated to the law firm by the Coutees. As the bankruptcy court noted, '[t]he law firm, under Louisiana law, was required to keep the client's funds in an identifiable trust account in order to avoid the charge of conversion.'

"The law firm had no legal right to put the funds to its own use, and thus lacked the requisite dominion required to be the initial transferee."

*Id.* at 141 (citation omitted.) The court concluded "the bank, not the firm, was the initial transferee of the funds." *Id.*

[¶ 17] Here, Johnston held this portion of the funds "only for the purpose of fulfilling an instruction to make the funds available to someone else.' " *Coutee*, 984 F.2d at 141 (quoting *Bonded*, 838 F.2d at 893). Under this reasoning, Merlyn Grabanski and not Johnston was the "first transferee" under N.D.C.C. § 13–02.1–08(2). Although the district court's finding that Johnston "was merely the conduit for the transfer" is not clearly erroneous, we conclude the court erred as a matter of law in holding Johnston liable for the transfer of $24,225.37 to Merlyn Grabanski.

**B**

[¶ 18] Johnston argues the district court erred in voiding a "major por-tion" of the $145,774.63 payment for attorney fees and legal services after finding Johnston was a good-faith transferee which had provided reasonably equivalent value for the transfer under N.D.C.C. § 13–02.1–08(1). Johnston contends the court's finding was a complete defense to the invalidation of any amount of the transfer.

[¶ 19] Section 13–02.1–08(1) and (4), N.D.C.C., provides:

"1. A transfer or obligation is not voidable under subdivision a of subsection 1 of section 13–02.1–04 against a person that took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

. . . .

"4. Notwithstanding voidability of a transfer or an obligation under this chapter, a good-faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to a lien on or a right to retain any interest in the asset transferred, enforcement of any obligation incurred, or a reduction in the amount of the liability on the judgment."

[¶ 20] Johnston mischaracterizes the district court's analysis of the issue and disregards that the debtor in this case is G & K because it was the only entity which received and transferred the SURE funds to the law firm. *See* N.D.C.C. § 13–02.1–01(6) (defining "debtor" as "a person that is liable on a claim"). The court explained:

"When all the surrounding circumstances are considered and evaluated, the debtor received reasonably equivalent value for the transfer of $150,000. Johnston Law was representing Tom and Mari Grabanski and their various business entities in numerous legal battles. In a pretrial discovery order issued by this court, it was noted that

Johnston Law's billing statements reflected 14 separate litigation files. PHI argues that G & K did not receive legal services of that value, and they make a good point.

. . . .

"Not withstanding [sic] voidability of a transfer, a good faith transferee is entitled, to the extent of the value given to the debtor for the transfer, to a reduction in the amount of the liability on the judgment.

"In reviewing the billing statements entered into evidence, it appears that as much as 15–25% of the legal fees can fairly be attributed to G & K and all the litigation it spawned. Accordingly, only $115,000 of the October 11, 2011 transfer will be voided. PHI incurred damages of $115,000 because of this fraudulent conveyance on October 11, 2011, the date the funds were transferred from G & K to Johnston Law."

The court initially found all funds constituted reasonably equivalent value for Johnston's representation of the Grabanskis and all of their various business entities. The court then correctly limited its determination of reasonably equivalent value to Johnston's representation of G & K alone, which was the only relevant debtor in this case. The court's finding on reasonably equivalent value did not exonerate Johnston from liability.

[¶ 21] PHI argues in its cross-appeal that the district court erred in finding Johnston provided any value to G & K because G & K was defunct before the legal representations occurred.

[¶ 22] Whether reasonably equivalent value has been received in exchange for a transfer is a question of fact subject to the clearly erroneous standard of review. *See Linderkamp*, 2013 ND 159, ¶ 20, 837 N.W.2d 147. Furthermore, we have said " '[t]he trial court is considered

an expert in determining the amount of attorney fees.' " *Wahl v. Northern Improvement Co.*, 2011 ND 146, ¶ 17, 800 N.W.2d 700 (quoting *State Farm Fire and Cas. Co. v. Sigman*, 508 N.W.2d 323, 327 (N.D.1993)). Documents in the record show legal services were performed for G & K after 2009 and the court found $35,000 in legal fees was "attributed" to G & K. PHI has not convinced us that the court's finding is clearly erroneous.

IV

[¶ 23] Johnston seeks reversal of the judgment based on claims of res judicata.

A

[¶ 24] Johnston argues the district court erred in holding PHI was not barred by res judicata from pursuing Uniform Commercial Code Article 9 remedies to collect the funds after it obtained a money judgment against the Grabanskis and G & K in federal court. According to Johnston, PHI improperly split its cause of action against G & K and can no longer enforce its security interest.

[¶ 25] We disagree with Johnston for two reasons. First, section 41–09–98(1) and (3) (9–601), N.D.C.C., provides in relevant part:

"1. After default, a secured party has the rights provided in this part and, except as otherwise provided in section 41–09–99, those provided by agreement of the parties. A secured party:

a. May reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure; . . .

"3. The rights under subsections 1 and 2 are cumulative and may be exercised simultaneously."

Under this provision, a creditor may obtain a money judgment on the debt and foreclose on collateral in one or more proceedings so long as there is no double recovery. *See Production Credit Ass'n v. Obrigewitch*, 443 N.W.2d 923, 926 (N.D. 1989).

[¶ 26] Second, "the doctrine of res judicata claim preclusion is premised upon the prohibition against splitting a cause of action," which means a party may not split a single cause of action "and maintain several lawsuits for different parts of the action." *Lucas v. Porter*, 2008 ND 160, ¶ 10, 755 N.W.2d 88. Johnston's argument ignores that the SURE payment was received by G & K after judgment was entered in the federal court action. We agree with the district court that "there can be no rational argument that the cause of action was split." We conclude Johnston's argument is without merit.

### B

[¶ 27] Johnston argues the district court erred in ruling the federal district court's decision was res judicata on whether PHI held a perfected security interest in the funds transferred to the law firm. Johnston argues the decision only determined "the validity of PHI's attached security interest—not whether that security interest had been PERFECTED." Johnston contends PHI failed to perfect its security interest because the financing statement filed by PHI contained legally deficient descriptions of the collateral.

[¶ 28] "While 'attachment' relates to the creation and enforceability of a security interest between the parties to the transaction, 'perfection' is an additional step which makes the security interest effective against third parties." *Thompson*

*v. Danner*, 507 N.W.2d 550, 554 (N.D. 1993). Section 41–09–13 (9–203), N.D.C.C., addresses attachment and enforceability of security interests and provides in relevant part:

"1. A security interest attaches to collateral when the security interest becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.

"2. Except as otherwise provided in subsections 3 through 9, a security interest is enforceable against the debtor and third parties with respect to the collateral only if:

a. Value has been given;

b. The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

c. One of the following conditions is met:

(1) The debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;"

[¶ 29] It is unnecessary to determine whether statements the district court made in a pretrial ruling constituted improper reliance on the federal court decision. The district court's final decision referenced PHI's financing statement and found "PHI perfected the security interest by filing a UCC–1 financing statement in the office of the North Dakota Secretary of State on September 5, 2008." PHI's financing statement provided:

"The Financing Statement to which this addendum is attached covers the types (and items) of property indicated below that Debtor owns or has sufficient rights in which to transfer an interest, now or

in the future, wherever the property is or will be located, and all proceeds and products of the property . . .:

. . . .

"Government Payments and Programs: All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program."

[¶ 30] Johnston argues that because PHI failed to identify the Texas crops in its financing statement there was no perfected security interest in those crops or the SURE payment received after the crops were destroyed. The problem with Johnston's argument, discussed below in section VI, is that crops or their proceeds are not the collateral at issue. Rather, government payments are the disputed collateral and the financing statement sufficiently describes the government SURE payment. We conclude PHI's security interest was properly perfected.

V

[¶ 31] Johnston argues the district court erred in calculating prejudgment interest beginning on the dates G & K transferred the funds to the law firm rather than the date PHI filed its complaint in this action.

■■■ [¶ 32] Section 32–03–04, N.D.C.C., provides:

"Every person who is entitled to recover damages certain or capable of being made certain by calculation, the right to recover which is vested in the person upon a particular day, also is entitled to

recover interest thereon from that day, except for such time as the debtor is prevented by law or by the act of the creditor from paying the debt."

We review decisions applying this statute under the abuse of discretion standard and, in this context, a court abuses its discretion "if it misinterprets or misapplies the law." *Roise v. Kurtz*, 1998 ND 228, ¶ 24, 587 N.W.2d 573.

■■■ [¶ 33] Johnston relies on *Midland Diesel Serv. & Engine Co. v. Sivertson*, 307 N.W.2d 555, 558 (N.D.1981), in which this Court held in an unjust enrichment action that the district court did not abuse its discretion in awarding interest only from the date of judgment rather than the date the defendant procured an asset because "[r]ecovery on unjust enrichment is an equitable allowance expressly unrelated to any previous obligation," and the plaintiff "thus did not have a 'vested' right of recovery until judgment was rendered." Here, contrary to Johnston's assertion, PHI had a vested right of recovery before PHI filed this lawsuit and judgment was rendered. *See Red River Wings, Inc. v. Hoot, Inc.*, 2008 ND 117, ¶ 59, 751 N.W.2d 206 (party's right to recover unpaid management fees vested on date management contracts were improperly terminated, not on date the district court granted motions to dismiss). However, we nevertheless conclude the district court abused its discretion in awarding prejudgment interest from the dates the SURE funds were transferred from G & K to Johnston. Johnston is the party sought to be held liable for the fraudulent transfers and PHI's right to recover did not vest until Johnston transferred the funds. We have held the court erred in holding Johnston liable for the transfer of funds to Merlyn Grabanski. Johnston can therefore be liable for prejudgment interest only from when funds

designated as attorney fees were removed from the law office trust account and placed in the office business account.

[¶ 34] We reverse the award of prejudgment interest and remand for recalculation.

## VI

[¶ 35] Choice argues in its cross-appeal that the district court erred in ruling PHI's security interest had priority over its security interest.

[¶ 36] Choice contends it has a first priority security interest in G & K's crops and their proceeds. Choice argues PHI did not perfect its security interest because crops are "farm products" under Texas law and PHI failed to file a financing statement with the Texas Secretary of State. *See Thompson,* 507 N.W.2d at 554 ("A creditor perfects a security interest in crops to be grown by filing an appropriate financing statement" under "U.C.C. § 9-302"); N.D.C.C. § 41-09-22 (9-302) ("While farm products are located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of an agricultural lien on farm products."). The problem with Choice's argument, like Johnston's argument, is that crops or their proceeds are not the collateral at issue here.

[¶ 37] Courts have struggled over the question whether agricultural program payments constituted crop proceeds or contract rights, accounts and general intangibles, and the results in those cases were not uniform. *See* B. Peterson, Annot., *Secured Transactions: Government agricultural program payments as "proceeds" of agricultural products under UCC § 9-306,* 79 A.L.R.4th 903 (1990), and cases collected therein. The Texas Supreme Court has ruled that payment-in-kind contracts under the federal diversion program are "proceeds" of crops for the purpose of filing financial statements. *See Sweetwater Prod. Credit Ass'n v. O'Briant,* 764 S.W.2d 230, 231-32 (Tex.1988). The Eighth Circuit Court of Appeals, applying North Dakota law, held federal diversion and deficiency payments are not crop proceeds, but are in the nature of contract rights, accounts or general intangibles. *See In re Kingsley,* 865 F.2d 975, 978-81 (8th Cir.1989). The Eighth Circuit Court of Appeals, applying Iowa law which Johnston argues applies here because of a choice of law provision in PHI's security agreements, also held that federal payment-in-kind program payments were accounts or general intangibles under the state's version of the Uniform Commercial Code. *See In re Sunberg,* 729 F.2d 561, 562-63 (8th Cir.1984).

[¶ 38] To avoid these "complex issues which arise," it had been suggested:

"Thus, if the banker desires a security interest in such program payments, it is a simple matter for the definitional terms used in the agreement to conform with the current program. By carefully, specifically tailoring security agreements in this way all parties would better understand what is intended, the results would be more predictable, and difficult interpretation problems would be avoided.

"Therefore, another way counsel may avoid a potential dispute is by drafting the security agreement to also cover contract rights, accounts, and general intangibles. Since the parties to the farm credit transaction are presumably aware of the existence of government program payments, references in a security agreement to these alternative forms of collateral may be read to include such payments, especially where that is the only way to give any meaning to the inclusion of those terms. In addi-

tion, unlike the dispute over whether government entitlement payments are "proceeds" under § 9–306(1) of the UCC, there appears to be no dispute over whether such payments are contract rights, accounts, or general intangibles."

Annot., 79 A.L.R.4th at 910–11 (footnotes omitted); *see also Kingsley,* 865 F.2d at 981.

[¶ 39] PHI and G & K structured their security agreement by separately listing a category of collateral that covered general intangibles and specifically included government agricultural program payments. This is what distinguishes *In re Waters,* 90 B.R. 946, 968 (N.D.Iowa 1988), relied upon by Johnston in the district court. In that case, the bankruptcy court held the creditor had a valid security interest only in deficiency payments attributable to land described in the security agreement because the "reference to deficiency payments, general intangibles, and crop proceeds all are included in the section which grants to PCA a security interest in the proceeds, disposition, and sale of secured property."

[¶ 40] Section 41–09–21(1)(9–301), N.D.C.C., provides:

"Except as otherwise provided in sections 41–09–23 through 41–09–26, the following rules determine the law governing perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral:

1. Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral."

"Paragraph (1) contains the general rule: the law governing perfection of security interests in both tangible and intangible collateral, whether perfected by filing or automatically, is the law of the jurisdiction of the debtor's location, as determined under Section 9–307." Official Comment 4 to N.D.C.C. § 41–09–21(9–301). It is undisputed that North Dakota was the location of G & K and that PHI filed its financing statements with the North Dakota Secretary of State before Choice did so. *See* N.D.C.C. § 41–09–72(1)(b)(9–501) (providing if law of this state governs perfection, financing statements "in all other cases" not enumerated may be filed in either the office of county recorder or the office of secretary of state); *In re Arithson,* 175 B.R. 313, 319 (D.N.D.1994) (financing statements covering CRP payments as collateral could be filed in either the county office or the secretary of state's office). Under N.D.C.C. § 41–09–42(1)(a)(9–322), N.D.C.C., "[c]onflicting perfected security interests ... rank according to priority in time of filing or perfection." Therefore, PHI's security interest has priority over Choice's security interest.

[¶ 41] The district court did not err in ruling PHI's security interest has priority.

## VII

[¶ 42] We do not address other arguments raised because they are either unnecessary to the decision or are without merit. We affirm the judgment in part, reverse in part, and remand for further proceedings.

[¶ 43] GERALD W. VANDE WALLE, C.J., and LISA FAIR McEVERS, J., JOHN T. PAULSON, S.J., concur.

[¶ 44] The Honorable JOHN T. PAULSON, S.J., sitting in place of Kapsner, J., disqualified.

SANDSTROM, Justice, concurring and dissenting.

[¶ 45] I respectfully dissent from that portion of the majority opinion that exon-

erates Johnston Law Office for its role in the fraudulent transfer of the $20,400 from G & K Farms to Merlyn Grabanski. The mere fact that Johnston put the money in its trust account before it was transferred to Merlyn Grabanski should not exonerate it. As the district court held, "The transaction bears all the elements of a fraudulent transfer, and is precisely the sort of insider transaction the statute is intended to prevent." Johnston is not the equivalent of the innocent "mere conduit" like a bank into which funds are deposited and then in good faith paid out when a check or similar instrument is presented. The majority states, "A law firm is not free to put monies deposited in a client trust account to its own use." But that does not authorize it to be an instrument of fraud. I would affirm the district court in holding Johnston liable for this as well.

[¶ 46] DALE V. SANDSTROM